E.D., infant, by their parent and natural guardian V.D., A.D., infant, by their parent and natural guardian V.D., Victoria Demtchenko, and Robert Byrd, Plaintiffs,

v.

Daniel TUFFARELLI, a case worker employed by the New York City Administration for Children's Services, City of New York, Eric Sanford, a supervisor employed by the New York City Administration for Children's Services, and Rodney Jackson, a supervisor employed by the New York City Administration for Children's Services, Defendants.

No. 08 Civ. 0861(PKC).

United States District Court, S.D. New York.

March 2, 2010.

Toni Lynn Gantz, New York City Law Department, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge:

In October 2006, the New York City Administration for Children's Services ("ACS") began a child-neglect investigation that resulted in the emergency removal of a ten-year-old autistic boy and his two-year-old brother. The two children, who are plaintiffs A.D. and E.D., along with their mother Victoria Demtchenko and E.D.'s father Robert Byrd, now allege that ACS and its employees deprived them of rights protected by the United States Constitution. They contend that there was no reasonable basis to support the emergency removal of A.D. and E.D., which occurred without judicial authorization or parental consent, and allege violations of the First, Fourth and Fourteenth Amendments. They also bring three state common law claims.

Both sides move for summary judgment. Defendants move to dismiss the federal claims on the grounds that interlocutory rulings of the Family Court bar this action pursuant to the *Rooker–Feldman* doctrine, and that they are entitled to qualified immunity. Plaintiffs move for partial summary judgment as to their constitutional claims against defendant Daniel Tuffarelli, arguing that Family Court proceedings provide grounds for offensive, non-mutual collateral estoppel on certain issues and entitle them to judgment in their favor. For the reasons explained below, this Court concludes that the *Rooker–Feldman* doctrine does not bar plaintiffs' claims. However, no reasonable jury could conclude on these facts that any defendant violated any right protected by the Constitution or federal law, and, therefore, summary judgment is granted in favor of all defendants. The Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## BACKGROUND

Except where expressly noted, the following facts are either undisputed or taken from the plaintiffs' version of the facts. All reasonable inferences are drawn in favor of the plaintiffs who are, on defendants' motion, the non-movants. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A. *The Reports of Possible Abuse that Preceded Emergency Removal of E.D. and A.D. on October 27, 2006.*

On October 27, 2006, defendant Daniel Tuffarelli, a child protective specialist employed by ACS, received notice of an oral report detailing suspected abuse or maltreatment inflicted upon plaintiff E.D., who was identified as an autistic child 10 years in age. (Def. 56.1 ¶¶ 1, 2; Pl. 56.1 Resp. ¶¶ 1, 2.) According to the oral report, which initially had been received by the New York Statewide Central Register of Child Abuse and Maltreatment, E.D. "sustained some injuries as a result of falling down a flight of stairs." (Def. 56.1 ¶¶ 1, 2; Pl. 56.1 Resp. ¶¶ 1, 2; Gantz Dec. Ex. B.) It proceeded to note:

> Mother and father fail to get the child medical instruction as they were in-

structed to. The child has sustained bruises to his face and can not walk. Parents failure to address the child's medical concerns places him at risk. Role of 2yr old [redacted] is unknown. (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2; Gantz Dec. Ex. B.) The report originated with a teacher of E.D. at the Brooklyn Blue Feather elementary school, which is a school for autistic children. (Def. 56.1 ¶ 3; Pl. 56.1 Resp. ¶ 3.) Tuffarelli was aware that the initial oral report was filed by E.D.'s teacher. (Def. 56.1 ¶¶ 6–7; Pl. 56.1 Resp. ¶¶ 6–7.)

On October 27, the teacher faxed a second, more detailed report to ACS. (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4; Gantz Dec. Ex. D.) According to the report, the teacher telephoned Victoria Demtchenko on October 26 to inquire about E.D.'s absence from school. (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4; Gantz Dec. Ex. D.) Demtchenko stated that E.D. "had fallen down a flight of steps," "was unable to walk," "had sustained bruises and scratches to his face," and "fell asleep." (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4; Gantz Dec. Ex. D.) According to the report, Demtchenko also told the teacher that E.D.'s "face was blue and that the[re] was no doctor able to attend his injuries," that E.D. "refused to go to school and she would not force him to," and that the teacher "further recommended that [Demtchenko] seek medical attention for [E.D.]." (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4; Gantz Dec. Ex. D.)

During her deposition in this case, plaintiff Demtchenko testified that she intentionally misrepresented the nature of E.D.'s condition to his teacher. (Pl. 56.1 Resp. ¶¶ 74–76.) According to Demtchenko, the day after E.D. fell down the flight of stairs, he refused to go to school. (Pl.

56.1 Resp. ¶ 74.) Demtchenko telephoned E.D.'s teacher and stated that E.D. could not attend school due to the fall, untruthfully telling the teacher that E.D. was limping. (Pl. 56.1 Resp. ¶ 75.) According to Demtchenko, she exaggerated E.D.'s injuries for fear that ACS would remove E.D. if she truthfully told the teacher that the source of E.D.'s school absence was "another tantrum." [1] (Pl. 56.1 Resp. ¶ 76.)

### B. The October 27 Visit to the Plaintiffs' Apartment by Tuffarelli and a Non–Party ACS Colleague.

Tuffarelli was assigned to the Demtchenko case on Friday, October 27, 2006. (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.) At approximately 6 p.m. on that day, Tuffarelli visited plaintiffs' residence to investigate the report of E.D.'s injuries. (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5; Pl. 56.1 ¶ 8.) Prior to his visit, he reviewed a summary of the teacher's oral report, as well as ACS case records from a previous investigation of the Demtchenko family, which took place from approximately July 2006 through September or October 2006. (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)

On the visit to the plaintiffs' apartment, Tuffarelli was accompanied by La–Toya Baird, an ACS colleague with the job title of "child protective specialist." (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.) All plaintiffs reside in a fifth-floor walk-up apartment on East 49th Street in Manhattan. (Pl. 56.1 Resp. ¶ 57.) On the date of the investigation Demtchenko was on maternity leave from a job teaching special education in New York public schools. (Pl. 56.1 Resp. ¶ 58.) Although plaintiffs dispute the characterization, Tuffarelli and Baird describe the conditions of the home as "deplorable,"

---

**1.** Plaintiffs assert that E.D.'s enrollment at the Brooklyn school required a morning bus ride of two-and-a-half hours, and that E.D. often was highly resistant to attending. (Pl. 56.1 Resp. ¶¶ 62, 65.) By the end of 2006, E.D. was attending a school closer to plaintiffs' Manhattan apartment. (Pl. 56.1 Resp. ¶ 73.)

including "loose wires" and considerable disarray in the kitchen and clutter on the apartment floors.[2] (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.) Tuffarelli and Baird observed E.D. shirtless and cooking over an open flame, an activity that Ms. Demtchenko asserts was always closely supervised and a favorite pastime for E.D. (Def. 56.1 ¶ 11; Pl. 56.1 Resp. ¶ 11.) Tuffarelli states that E.D. had a cut and a large bruise on his face; in her deposition, Ms. Demtchenko testified that E.D.'s only visible wound was a recent inch-and-a-half scratch on his face. (Def. 56.1 ¶ 12; Pl. 56.1 Resp. ¶ 12.) Tuffarelli and Baird also observed a large knife that appeared to be accessible to E.D. (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)

Tuffarelli attempted to interview E.D. about his injuries, but E.D.'s verbal skills were limited by autism, making communication between the two impossible. (Def. 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13.) Tuffarelli and Demtchenko discussed the circumstances involving E.D.'s fall down a seven-step flight of stairs two days earlier. (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.) During their conversation, Tuffarelli suggested that E.D. receive medical care, to which Ms. Demtchenko responded that she would not seek medical help. (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15.) She also confirmed that E.D. had missed several days of school. (Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16.)

Plaintiff Robert Byrd is the father of E.D. and custodian of A.D. (Pl. 56.1 ¶ 2.) He arrived at the apartment while the visit by Tuffarelli and Baird was already underway. (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18.) Tuffarelli asserts that Demtchenko and Byrd were not forthcoming with information, characterizations that plaintiffs dispute. (Def. 56.1 ¶¶ 17, 19; Pl. 56.1 Resp. ¶¶ 17, 19.) According to Demtchenko, she was startled when Tuffarelli and Baird made an unannounced visit to her home, and found Tuffarelli to behave in an unprofessional and demeaning manner. (Pl. 56.1 Resp. ¶ 17.) Byrd characterizes Tuffarelli's demeanor as "macho and bullying," and testified at deposition that the visit devolved into the parties "talking loudly in addition to the kids yelling and it was spinning out of control." (Pl. 56.1 Resp. ¶ 17.) According to Byrd, he then asked Tuffarelli and Baird to depart the premises. (Pl. 56.1 Resp. ¶ 17; Def. 56.1 ¶ 20.)

### C. *Tuffarelli's Calls to Supervisors and the Removal of E.D. and A.D.*

After exiting the apartment on Friday evening, Tuffarelli telephoned defendant Eric Sanford. (Def. 56.1 ¶ 21; Pl. 56.1 Resp. ¶ 21.) Sanford was Tuffarelli's immediate supervisor. (Pl. 56.1 Resp. ¶ 21.) Sanford directed Tuffarelli to contact the police for assistance, and then to call an ACS child protection manager in order to explain the situation. (Def. 56.1 ¶ 21; Pl. 56.1 Resp. ¶ 21.) At this time, Sanford did not believe that there was sufficient evidence to support removal, and instead told Tuffarelli to return to the apartment with police officers in order to continue the investigation. (Pl. 56.1 Resp. ¶ 21.)

Two police officers subsequently arrived and escorted Tuffarelli and Baird back to the Demtchenko apartment. (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33.) When Tuffarelli called Sanford for a second time and again asserted that the children should be removed, Sanford directed Tuffarelli to call defendant Rodney Jackson. (Pl. 56.1 Resp. ¶ 21.) Sanford also spoke to Baird, who told Sanford that she agreed with Tuffarelli's conclusion that the children should be removed. (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 22.)

---

**2.** The parties' Local Rule 56.1 statements discuss "loose" wires, but do not explain what is meant by the phrase. Plaintiffs contend that the wiring contained no live electrical current. (Pl. 56.1 Resp. ¶ 10.)

Jackson had the job title of "Child Protection Manager," and was responsible for authorizing ACS removals. (Def. 56.1 ¶ 23; Pl. 56.1 Resp. ¶ 23.) At that time, Jackson had been employed by ACS for seventeen years, including eight as a "Child Protection Manager." (Def. 56.1 ¶ 24; Pl. 56.1 Resp. ¶ 24.) Tuffarelli described the circumstances of the home and recommended that E.D. be removed, indicating that the home was not safe for an autistic child. (Def. 56.1 ¶¶ 25, 26; Pl. 56.1 Resp. ¶¶ 25, 26.) After hearing Tuffarelli's description of the situation, Jackson authorized removal. (Def. 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28.) Jackson states that his authorization was influenced by concern that E.D. was suffering from non-visible injuries, E.D.'s inability to communicate about his physical condition, and the apparent uncooperativeness of Demtchenko and Byrd. (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.) According to Jackson, in his experience, children with special needs are at higher risk of abuse, and that in the case of autistic, speech-impaired children, "professionals' reliance on physical observation of the child and his or her environment becomes key." (Def. 56.1 ¶ 30; Pl. 56.1 Resp. ¶ 30; Jackson Dec. ¶ 11.)

After Jackson granted removal authorization, Baird and Tuffarelli effected an emergency removal of E.D. and his two-year-old brother, A.D. (Def. 56.1 ¶ 33; Pl. 56.1 Resp. ¶ 33; Pl. 56.1 ¶ 12.) A.D. and E.D. were placed in emergency foster care and remained away from the Demtchenko home for six nights. (Pl. 56.1 ¶ 13.)

D. *Developments Subsequent to the Removal of E.D. and A.D.*

As noted, Tuffarelli first visited the home at 6 p.m. on Friday, October 27, 2006. At that hour, no application could be made to the Family Court to seek authorization prior to removal. (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32.) Monday, October 30, 2006 was the Family Court's next business

day, and on that date, ACS filed removal petitions for A.D. and E.D. pursuant to Article 10 of New York's Family Court Act. (Def 56.1 ¶ 38; Pl. 56.1 ¶ 38.) Tuffarelli signed the petitions and was present throughout the removal hearing; he also was the only witness to testify at the hearing on behalf of the ACS. (Def. 56.1 ¶ 38; Pl. 56.1 ¶¶ 20, 28, 30; Def. 56.1 Resp. ¶ 30.) That day, the Family Court issued two orders that authorized temporary removal of E.D. and A.D., citing lack of medical attention to E.D.'s injuries and E.D.'s school absences, and the conditions of the plaintiffs' apartment. (Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 40.) Plaintiffs did not appeal the orders of October 30, and now assert that they lack legal significance. (Def. 56.1 ¶¶ 41–42; Pl. 56.1 Resp. ¶ 40–42.)

In separate proceedings on the same day before the same judge who authorized the removal, a post-deprivation hearing was initiated in Family Court. (Def. 56.1 ¶ 39; Pl. 56.1 Resp. ¶ 39.) Byrd and Demtchenko were present and represented by counsel. (Def. 56.1 ¶ 39; Pl. 56.1 Resp. ¶ 39.) The hearing continued on October 31 and November 1. (Def 56.1 ¶ 44; Pl. 56.1 Resp. ¶ 44.) At the close of the post-deprivation hearing, the Family Court ruled that E.D. and A.D. could be paroled to Demtchenko and Byrd "under very close supervision," finding no imminent danger to the children. (Def. 56.1 ¶ 44; Pl. 56.1 Resp. ¶ 44.) The Family Court qualified its ruling by noting "serious concerns" and "very significant problems that need to be addressed." (Def. 56.1 ¶ 44; Pl. 56.1 Resp. ¶ 44.) The Family Court issued its parole order on November 2; E.D. and A.D. were returned to the home on that day. (Def. 56.1 ¶¶ 45–46; Pl. 56.1 Resp. ¶¶ 45–46.)

The Family Court held additional hearings on February 8, March 21 and March 30, 2007 as to whether a finding of neglect

should be entered as to Demtchenko and Byrd. (Def. 56.1 ¶ 47; Pl. 56.1 Resp. ¶ 47.) A.D. and E.D. were represented in the proceedings by a Legal Aid Society attorney, who, at the time of the hearing, urged the Family Court to make a finding of neglect as to Byrd and Demtchenko. (Def. 56.1 ¶ 48; Pl. 56.1 Resp. ¶ 48.) On May 10, 2007, after hearing the testimony of approximately ten witnesses, the Family Court issued an order finding that Demtchenko and Byrd neglected E.D. and A.D. by failing to provide adequate medical care and proper education. (Def. 56.1 ¶ 49; Pl. 56.1 Resp. ¶ 49.) After the Family Court's ruling, ACS continued to investigate the circumstances of the Demtchenko home. (Def. 56.1 ¶ 50; Pl. 56.1 Resp. ¶ 50.)

On November 1, 2007, the Appellate Division, First Department, reversed "on the law and the facts" the Family Court's findings of neglect. (Pl. 56.1 ¶ 37; *In re Alexander D.*, 45 A.D.3d 264, 264, 845 N.Y.S.2d 244 (1st Dep't 2007).) Plaintiffs note that, by this point, E.D. and A.D.'s Legal Aid Society attorney had changed positions, and filed papers in the Appellate Division arguing that Demtchenko and Byrd should not be found in neglect. (Pl. 56.1 Resp. ¶ 48.) The First Department concluded that the record indicated that E.P.'s injuries were minor, that there was no evidence showing that his education had been impaired by absences, and that there was no evidence showing a substantial risk of harm arising from E.P.'s placement with his mother. *Alexander D.*, 45 A.D.3d at 264–65, 845 N.Y.S.2d 244.

### E. *The Present Action.*

This action was commenced on January 24, 2008. Plaintiffs filed a First Amended Complaint and Jury Demand ("the Complaint") on June 23, 2008. In a claim purportedly brought pursuant to 28 U.S.C. § 1343(a)(3) and (4), the plaintiffs assert that the individual defendants violated the First, Fourth and Fourteenth Amendments in the events leading up to and surrounding the removal of E.D. and A.D. (Compl. ¶¶ 2, 3, 45–46.) Tuffarelli, Sanford and Jackson are all sued in their individual capacities. (Compl. ¶¶ 7–9.) Plaintiffs also assert common-law claims of negligence against all individual defendants (Compl. ¶¶ 48–50), malicious prosecution against defendants Tuffarelli and the City of New York (Compl. ¶¶ 52–53), and abuse of process against defendants Tuffarelli and the City of New York (Compl. ¶¶ 55–56). All discovery is closed. As noted, defendants have moved for summary judgment, and plaintiffs have moved for partial summary judgment on liability as to their constitutional claims against Tuffarelli.

## SUMMARY JUDGMENT STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c) (2), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest

"merely on allegations or denials" of the facts asserted by the movant. Rule 56(e)(2), Fed.R.Civ.P. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (internal quotations and citations omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c)(2), Fed.R.Civ.P. In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) (citing *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348); *see also Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative") (citations omitted). An opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 n. 14 (2d Cir.1981) (quotation marks omitted).

## DISCUSSION

### I. *The Court Accepts the Parties' Construction of the Complaint as Asserting Constitutional Violations Pursuant to 42 U.S.C. § 1983.*

Defendants move for summary judgment in their favor on claims brought pursuant to 42 U.S.C. § 1983, and plaintiffs move for partial summary judgment on claims against Tuffarelli pursuant to section 1983. I note at the outset, and raise *sua sponte,* that the complaint does not expressly invoke section 1983. Rather, the First Amended Complaint and Jury Demand, dated April 28, 2008 and docketed on June 23, 2008, asserts that the defendants were deprived of their constitutional rights and cites 28 U.S.C. § 1343(a)(3) and (4). (Compl. ¶ 3.)

Section 1343 is a jurisdictional statute, whereas section 1983 is a remedial statute. Section 1343(a)(3) gives district courts original jurisdiction "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act ·of Congress providing for equal rights of citizens or all persons within the jurisdiction of the United States." Section 1343(a)(4) gives district courts original jurisdiction for any action "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

██ Sections 1343 and 1983 are "complementary" and share common origins in the Ku Klux Klan Act of 1871. *See Ex-*

amining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 581–84, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (summarizing statutory history of sections 1343 and 1983). Section 1343 is a "jurisdictional predicate for section 1983 actions.... Where the plaintiff's complaint alleges sufficient facts to state a cause of action under section 1983, the jurisdictional requirements of section 1343 are satisfied, provided the claim alleged is not obviously frivolous, wholly insubstantial, or essentially fictitious." *Kohl Indus. Park Co. v. Rockland County*, 710 F.2d 895, 899 (2d Cir.1983) (internal quotation marks omitted); *see also Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 399–400, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (treating section 1343 as jurisdictional complement to section 1983's remedial role).

Although the Complaint relies solely on the jurisdictional statute and not its remedial counterpart, all parties construe the Complaint as asserting claims pursuant to section 1983. (*See, e.g.*, Pl. Mem. in Support at 1; Def. Mem. in Support at 9–18.) Consistent with the mandate of Rule 1, Fed.R.Civ.P., I will deem the Complaint to have invoked section 1983.[3]

II. *The Rooker–Feldman Doctrine Does Not Bar Plaintiffs' Claims.*

■ Because the issue goes to this Court's subject matter jurisdiction, *see Morrison v. City of New York*, 591 F.3d 109, 112 (2d Cir.2010), I first address defendants' argument that summary judgment should be granted in their favor because plaintiffs' claims require the Court to sit in review of state-court proceedings, and therefore are barred by *Rooker–Feld-*

man. For the reasons explained below, defendants' motion for summary judgment on *Rooker–Feldman* grounds is denied.

■ The *Rooker–Feldman* doctrine originates in the Supreme Court's decisions of *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). *Rooker–Feldman* bars federal courts from exercising jurisdiction over claims by " 'state-court losers' " who challenge " 'state court judgments rendered before the district court proceedings commenced.' " *Lance v. Dennis*, 546 U.S. 459, 460, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006) (per curiam) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)). It asserts the negative implications of 28 U.S.C. § 1257, which grants the Supreme Court exclusive review of decisions by the highest state courts implicating controversies under the U.S. Constitution, federal law, or treaties. *See Exxon Mobil*, 544 U.S. at 291, 125 S.Ct. 1517; *see also Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir.2009) (" 'Underlying the *Rooker–Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions.' ") (quoting *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 85 (2d Cir.2005)). The Second Circuit has held that four threshold factors must be established in order for the *Rooker–Feldman* bar to apply:

First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries

---

**3.** Although I do not consider the issue, I note that plaintiffs' exclusive reliance on section 1343 may have provided an independent basis to dismiss the Complaint, or, at the very least, require its amendment. *See. e.g., Allen v.*

*Gold Country Casino*, 464 F.3d 1044, 1048 (9th Cir.2006) (affirming dismissal of "claim under 28 U.S.C. § 1343 because this jurisdictional statute does not provide a cause of action").

caused by [a] state-court judgment [.]" Third, the plaintiff must "invite district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"—i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Id.* at 101 (alterations in original) (quoting *Hoblock,* 422 F.3d at 85).

A close review of *Green*—which was decided by the Second Circuit subsequent to the filing of defendants' motion—is particularly helpful here. As in this case, the plaintiffs in *Green* contended that defendants violated their Constitutional rights during the course of events surrounding the removal of a child by ACS and in subsequent proceedings in Family Court. *Id.* at 99–100. In *Green,* ACS investigated a report of child neglect. *Id.* at 99. At the investigation's conclusion, child neglect proceedings began in Family Court. *Id.* The court ordered temporary removal of the child and remanded the child to ACS custody. *Id.* at 100. The plaintiff in *Green* immediately petitioned for the child's return, which occurred four days later, with the Family Court concluding that there was no imminent risk to the child's health. *Id.* Neglect proceedings continued but were ultimately dismissed. *Id.* The child's mother then filed a claim in federal court, asserting the conduct the ACS officials violated state law and the Constitution. *Id.*

The district court in *Green* held that the *Rooker–Feldman* doctrine barred the plaintiffs' claims, and the Second Circuit reversed. *Id.* at 101. In applying the four-factor *Rooker–Feldman* test set forth above, the Second Circuit concluded that the *Green* plaintiff was not a "loser" in state court: although the Family Court issued an order temporarily removing the

child from custody, the child was returned four days later, and the proceedings ultimately were dismissed. *Id.* at 102. In addition, the plaintiff did not " 'invite district court review and rejection' " of a state court's judgment. *Id.* (quoting *Hoblock,* 422 F.3d at 85). As described by the Second Circuit: "Plaintiff's child has been returned to her, and thus she 'plainly had not repaired to federal court to undo the [Family Court] judgment.' The only conceivable 'judgment' against plaintiff—the temporary removal of her child—has already been undone." *Id.* (alteration in original) (quoting *Exxon Mobil,* 544 U.S. at 293, 125 S.Ct. 1517). The Second Circuit proceeded to observe that the rationale underlying *Rooker–Feldman*—to ensure that only the Supreme Court, and not lower federal courts, exercises review of state-court decisions-did not apply when there was no legal or practical reason to further appeal the state-court decision that caused the alleged injury. *Id.* at 102–03. "The situation would have been different if the Family Court had entered a final order of disposition permanently removing the plaintiff's child from her custody and plaintiff had brought this action seeking the return of her child." *Id.* at 103.

Following *Green,* the *Rooker–Feldman* doctrine does not bar the plaintiffs' claims in this action. As in *Green,* the plaintiffs in this case were not "state-court losers," *Lance,* 546 U.S. at 460, 126 S.Ct. 1198, and, in fact, obtained judgment in their favor on appeal. *Alexander D.,* 45 A.D.3d at 264–65, 845 N.Y.S.2d 244. E.D. and A.D. were returned to the home after six nights' absence (Pl. 56.1 ¶ 13) and the Appellate Division held that the evidence did not support a finding of neglect. This is not the type of situation noted in *Green,* where a child is permanently removed from custody and the parent seeks the child's return. 585 F.3d at 103. Instead, as in *Green,* the adverse judgment against

the plaintiffs was "undone" prior to commencement of this action. *Id.* at 102. Relatedly, and also similar to *Green*, the plaintiffs here do not seek review or rejection of a state court judgment that ultimately issued in their favor. *Id.* at 102–03; *see also V.S. v. Muhammad*, 595 F.3d 426, 430 (2d Cir.2010) ("Here, as in *Green*, [plaintiff] is not a 'state-court loser,' since, prior to the commencement of the instant action, ACS had withdrawn all its claims against [the plaintiff] and the Family Court had released [the child] to [the parent's] custody.").

The defendants' motion for summary judgment in their favor on the basis of the *Rooker–Feldman* bar against district court review of state-court decisions is denied.

### III. *No Reasonable Jury Could Find in Plaintiffs' Favor on Their Claim of a Violation of Rights Protected by the Constitution.*

The individual defendants argue that summary judgment should be granted in their favor because they are shielded from suit on grounds of qualified immunity. For the reasons explained below, I conclude that, on the undisputed facts and the facts relied upon by plaintiffs, no reasonable jury could find in plaintiffs' favor on their constitutional claims.

### A. *The "Reasonable Basis" Test for Officials in Child Removal Cases.*

The removal of a child from the home implicates strong interests that often are in tension. "It has long been settled in this Circuit 'that a parent's interest in the custody of a child [is] a constitutionally protected liberty interest subject to due process protection.' " *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir.1999) (alteration in original) (quoting *Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir.1992)). This interest in familial integrity is "counterbalanced by the 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.' " *Id.* at 104 (quoting *Manzano v. South Dakota Dep't of Social Servs.*, 60 F.3d 505, 510 (8th Cir.1995)); *see also Nicholson v. Scoppetta*, 344 F.3d 154, 158 (2d Cir.2003) ("Few matters are closer to the core of a State's essential function than the protection of its children against those who would, intentionally or not, do them harm."). The familial liberty interest and the government's interest in protecting minors may clash, leaving officials with a narrow range of options:

> "Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights."

*Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir.2000) (quoting *van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 866 (2d Cir.1990)). When balancing such "weighty interests," courts have "impose[d] few concrete restrictions on case workers ... short of obvious extremes," such as manufacturing evidence or ignoring exculpatory information. *Wilkinson*, 182 F.3d at 104; *accord Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir.1999) (acknowledging in the qualified immunity context the "dearth of explicit standards in this Circuit applicable to caseworker conduct during child abuse investigations.").

 In *Wilkinson*, Judge Sotomayor formulated a "reasonable basis" test for evaluating whether an official acted unlaw-

fully in removing a child. 182 F.3d at 104–06.[4] Under the reasonable-basis test, "[a]n investigation passes constitutional muster provided that case workers have a 'reasonable basis' for their findings of abuse." *Id.* at 104. "In applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between 'difficult alternatives' often need to be made on the basis of limited or conflicting information." *Id.* at 105. The "reasonable basis" test "permit[s] investigators considerable discretion" in their handling of abuse claims, as well as a measure of judicial "deference" in the review of investigators' conduct. *Id.* at 104, 106. "[A] mere failure to meet local or professional standards, without more, should not generally be elevated to the status of constitutional violation." *Id.* at 106.

Generously read, the Complaint alleges that the defendants were persons acting under the color of state law who violated the plaintiffs' rights guaranteed by the First, Fourth and Fourteenth Amendments to the Constitution. (Compl. ¶¶ 45–46.) It is silent as to what clauses of those Amendments the plaintiffs contend were violated. The Complaint does not, for instance, explain whether the Fourteenth Amendment claim is intended to allege that the plaintiffs were denied substantive due process, procedural due process, equal protection rights, or some combination thereof. *See Wilkinson*, 182 F.3d at 103–04 (a parent's constitutional interest in custody of child is established by substantive due process, as well as the equal pro-

tection clause and the Ninth Amendment); *Tenenbaum*, 193 F.3d at 594–95 (weighing claim implicating removal of a child pursuant to procedural due process protections).

Although the defendants have extensively briefed the authority relevant to such claims, including citations to precedent in this Circuit, the plaintiffs' memorandum of law consists almost entirely of a discussion of the record, with no meaningful discussion of governing law, and no clarification as to which precise constitutional rights they claim were violated.[5] (Pl. Opp. Mem. at 15–20.) Plaintiffs' discussion of the record also focuses on acts of alleged wrongdoing by Tuffarelli, with scant reference to purported misconduct by the other defendants. (*Id.*)

In resolving the defendants' motion for summary judgment, therefore, I first weigh whether, in response to defendants' summary judgment motion, plaintiffs have come forward with facts that, if believed, could support a finding in their favor. I conclude that the plaintiffs have not.

### B. *Summary Judgment is Granted to Defendants on Plaintiffs' Procedural Due Process Claim.*

 I begin by considering plaintiffs' claim that the individual defendants deprived them of procedural due process protections established by the Fourteenth Amendment. "As a general rule ... before parents may be deprived of the care, custody, or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Tenenbaum*, 193 F.3d at

---

4. Among other things, *Wilkinson* made clear that the "reasonable basis" test as to the constitutionality of caseworkers' actions is distinct from the qualified immunity analysis "of whether it was objectively reasonable for a case worker to believe that such a basis existed," since the latter determination "de-

pends on the clarity of existing law at the time of ... events," rather than "the facts and events of a particular case...." *Id.* at 107 n. 10.

5. Plaintiffs have been represented by counsel throughout this action.

593. A pre-deprivation hearing may act as a safeguard to protect the family's due process rights. *See, e.g., Stanley v. Illinois*, 405 U.S. 645, 656–57, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Cecere*, 967 F.2d at 829 (absent imminent danger to the child, due process requires a hearing before a child can be taken from parental custody); *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir.1991) ("[A] parent's interest in the custody of his or her children is a constitutionally protected 'liberty' of which he or she may not be deprived without due process, generally in the form of a predeprivation hearing."); *Johnson v. New York*, 2007 WL 764514, at *5 (E.D.N.Y. Mar. 9, 2007) (same), *aff'd*, 283 Fed.Appx. 877 (2d Cir.2008).

■■■ However, "in emergency circumstances, a child may be taken into custody by a responsible State official without court authorization or parental consent." *Tenenbaum*, 193 F.3d at 594 (citations and quotation marks omitted). "If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent." *Id.* at 594. Risks that a child will suffer "actual injury," "sexual abuse" or be " 'left bereft of care and supervision' can suffice to create an 'emergency.' " *Nicholson*, 344 F.3d at 171; *see also Hurlman*, 927 F.2d at 81 (emergency circumstances arise when "the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is

evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence.").[6]

■■■ In *Tenenbaum*, based upon a teacher's report of suspected sexual abuse, a caseworker removed a five-year-old girl from her kindergarten class pursuant to emergency-removal provisions, without court order or authorization from the child's parents. 193 F.3d at 587. The child was taken to a hospital, where physicians examined her for evidence of sexual abuse. *Id.* No evidence of abuse was found, the child was returned to her parents, and the case was abandoned as "unfounded." *Id.* The Second Circuit held that the child's removal violated procedural due process as to both the child and her parents. *Id.* at 594–95. In holding that there was no "emergency" justification for such removal, *Tenenbaum* observed as follows:

> While "there is a sufficient emergency to warrant officials' taking [a child into] custody without a prior hearing if [he or she] is immediately threatened with harm," the converse is also true. If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent; there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody and management of their child. If, irrespective of whether there is time to obtain a court order, all interventions are effected on an "emergency" basis

---

6. New York's statutory framework authorizing the emergency removal of a child is similar to the standard set forth by the Second Circuit. It provides for emergency removal without a court order if an official "has reasonable cause to believe that the child is in such circumstance or condition that his or her continuing in said place of residence or in the care and custody of the parent or person legally responsible for the child's care presents an imminent danger to the child's life or health." N.Y. Fam. Ct. Act § 1024(a)(i). Emergency removal is appropriate only if "there is not time enough to apply for an order" by the Family Court. *Id.* § 1024(a)(ii).

without judicial process, pre-seizure procedural due process for the parents and their child evaporates.

*Id.* at 594–95 (alterations in original) (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). *Tenenbaum* emphasized that officials decided one day in advance to remove the child, leaving them sufficient time to seek a court order. *Id.* at 595. "If there was reasonably sufficient time, there was no emergency." *Id.* The Second Circuit distinguished the window of time in which to seek judicial authorization from circumstances in which immediate removal was needed: in the latter case, there would, as a matter of law, be no due process violation. *Id.* "[W]hile the paramount importance of the child's well-being can be effectuated only by rendering State officials secure in the knowledge that they can act quickly and decisively in urgent situations and that the law will protect them when they do, there is a critical difference between necessary latitude and infinite license." *Id.* "The government must offer 'objectively reasonable' evidence that harm is imminent." *Nicholson,* 344 F.3d at 171 (citing *Gottlieb v. County of Orange,* 84 F.3d 511, 520 (2d Cir.1996)).

In this case, defendant Tuffarelli, accompanied by non-party La–Toya Baird, arrived at the plaintiffs' apartment on a Friday evening, after Family Court had closed for the day. (Def. 56.1 ¶¶ 5, 8, 32; Pl. 56.1 Resp. ¶¶ 5, 8, 32.) The report filed by E.D.'s teacher noted that E.D. sustained injuries from falling down a flight of stairs, that his parents declined to seek medical attention and that E.D. had missed several days of school. (Def. 56.1 ¶¶ 1–4; Pl. 56.1 Resp. ¶¶ 1–4.) At the time Tuffarelli and Baird arrived at the plaintiffs' apartment, the report had not been corroborated, and there was not yet a basis to seek court authorization for removal. For the purpose of the plaintiffs' procedural due process claim, the question is whether defendants had a reasonable basis

to conclude that E.D. and A.D. were at immediate risk, *see Wilkinson,* 182 F.3d at 104, to the point that an emergency warranted removal of the children without waiting until the following Monday for court authorization, *see Tenenbaum,* 193 F.3d at 594–95.

While the plaintiffs contest certain of Tuffarelli's characterizations as to the condition of the residence, several key facts are not in dispute, including that E.D. had fallen down a flight of stairs (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14), that Demtchenko stated that she would not seek outside medical help for E.D. (Def. 56.1 ¶ 15), that E.D.'s autism left him unable to communicate orally with Tuffarelli and Baird (Def. 56.1 ¶ 13), that tensions between the two ACS officials and the family seemed to escalate over the course of the visit to the point where Byrd feared that the situation was "spinning out of control" (Pl. 56.1 Resp. ¶ 17), and that Byrd instructed Tuffarelli and Baird to leave the premises. (Pl. 56.1 Resp. ¶ 17; Def. 56.1 ¶ 20.)

It is further significant that Tuffarelli's observations of E.D.'s conditions followed his review of the reports filed by E.D.'s teacher. (Def. 56.1 ¶¶ 5, 6; Pl. 56.1 Resp. ¶¶ 5, 6.) His first-hand observations confirmed all key details of the teacher's abuse reports, including that E.D., an autistic child, had fallen down the flight of stairs and thereby incurred visible injuries to his face, that Demtchenko refused to seek medical treatment for E.D., and that E.D. had missed several days of school. (Def. 56.1 ¶¶ 1, 2, 4, 12, 14–16; Pl. 56.1 ¶¶ 1, 2, 4, 12, 14–16.) Demtchenko also told Tuffarelli that she believed E.D. had hurt his leg, because he had a limp. (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.) As noted above, Demtchenko now asserts that her statement to E.D.'s teacher about a leg injury was a fabrication intended to conceal that E.D. was unable to attend school

"due to another tantrum." (Pl. 56.1 Resp. ¶ 76.) No parties contend that Tuffarelli should have been aware of the inaccuracies in Demtchenko's statement about E.D.'s limp at the time of investigation, and it is the case that Tuffarelli's observations and Demtchenko's remarks confirmed the contents of the teacher's initial reports of abuse. This corroboration supports the reasonableness of defendants' actions. *See Wilkinson,* 182 F.3d at 105–06 (substantiation of credible report of abuse supports reasonableness of caseworkers' conclusions, even when investigators fail to thoroughly probe potentially exculpatory evidence).

In detailing the allegedly "deplorable" conditions of the apartment, Tuffarelli and Baird describe "items blanketing the floor," an unclean kitchen, drawings and writings covering the walls, "loose" wires, "mattresses that were uncovered and appeared to Mr. Tuffarelli to be stained with urine and feces," and the presence of "a large knife accessible to both E.D. and A.D." (Def. 56.1 ¶ 10.) However, for the purposes of this motion and to the extent that there is a dispute over the issue, I accept as true only plaintiffs' description of the conditions in the apartment. Demtchenko testified in her deposition that the apartment's condition was in part "a creative mess," due to the fact that she was preparing dinner in a rush in order to attend a free concert. (Pl. 56.1 Resp. ¶ 10(a)(ii).) As a result, a variety of half-prepared foods and sauces were in the kitchen. (Pl. 56.1 Resp. ¶ 10(a)(iii).) A knife was present, but beyond the reach of two-year-old A.D. (Pl. 56.1 Resp. ¶ 10(a)(vi).) Various of E.D.'s toys were spread around the living room floor, including wooden blocks and a toy train set, and the apartment walls were covered in writing and drawings "because they are

used like walls in a preschool" to educate the children. (Pl. 56.1 Resp. ¶ 10(a) (viii-ix).) As a result, the walls were frequently painted over. (Pl. 56.1 Resp. ¶ 10(a)(x).) A futon mattress and a broken futon frame were in the living room. (Pl. 56.1 Resp. ¶ 10(a)(xii).) According to Demtchenko, children with autism often break furniture, and E.D. had broken the futon frame. (Pl. 56.1 Resp. ¶ 10(a)(xii).) As to Tuffarelli's observations of E.D. cooking over an open flame, plaintiffs contend that E.D. was supervised, "loves cooking," and had never burned or cut himself while cooking, (Pl. 56.1 Resp. ¶ 11(a)(iv), (b)(1).) Demtchenko claims that E.D. was merely helping himself to another serving of food, and was not actively cooking at the time of Tuffarelli's visit. (Pl. 56.1 Resp. ¶ 10(a)(v).) Plaintiffs also cite to the conclusions of an expert witness who they retained; the expert noted that the "loose" wiring outside of the bathroom did not carry live electrical currents, and that she found no signs of feces or urine on the mattresses. (Pl. 56.1 Resp. ¶ 10.)

In addition to disputing characterizations of the apartment's condition, plaintiffs note the different descriptions Tuffarelli gave as to the visible injuries on E.D.'s face. He variously described a "rather large black and blue mark bruise," and a "scratch or scab" around a bruise. (Pl. 56.1 Resp. ¶ 12.) Plaintiffs note a concurring opinion of the Appellate Division, which observed that the evidence showed any injuries incurred by E.D. were minor and capable of treatment with "simple household nursing." [7] (Pl. Opp. Mem. at 19, citing *Alexander D.,* 45 A.D.3d at 265–66, 845 N.Y.S.2d 244 (McGuire, J., concurring).) To the extent that plaintiffs have pointed out variations in Tuffarelli's description of E.D.'s injuries, they are "not

---

7. A concurring judicial opinion is not evidence and is hearsay. Moreover, it could have no preclusive effect against Tuffarelli, who was not a party to the proceeding.

significantly probative," and do not defeat defendants' summary judgment motion. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

█ Plaintiffs also emphasize the demeanor that Tuffarelli displayed during his visit to the apartment. Plaintiffs note that Tuffarelli and Baird arrived unannounced. (PL 56.1 Resp. ¶ 17.) Demtchenko characterizes Tuffarelli as wearing "a lot of hair gel and jewelry," and states that he appeared to "check[ ] his muscles like you do before you go to a boxing ring or something." (Pl. 56.1 Resp. ¶ 17.) According to Byrd, Tuffarelli wore "a muscle shirt" and had a toothpick in his mouth. (Pl. 56.1 Resp. ¶ 17.) He "didn't look official," and made various accusations against Demtchenko to the effect that there was "an immediate danger" in the apartment. (Pl. 56.1 Resp. ¶ 17.) Demtchenko testified in her deposition that when E.D. became visibly distressed, Tuffarelli adopted a defensive, judo-like physical posture toward E.D., and appeared frightened of E.D. (PL 56.1 Resp. ¶ 17.) Tuffarelli asked Demtchenko whether she was on food stamps and received public assistance. (Pl. 56.1 Resp. ¶ 17.) According to Byrd, E.D. "was flapping his arms and making autistic noises," A.D. was crying and Demtchenko was "very distraught." (PL 56.1 Resp. ¶ 17.) Byrd hoped that the family could "get somebody better" from ACS. (Pl. 56.1 Resp. ¶ 17.) When he asked Tuffarelli to leave the premises, Tuffarelli pointed a finger at Byrd's chest, and shortly thereafter said, "You'll see me again sooner than you think." (Pl. 56.1 Resp. ¶ 17.) While plaintiffs' perceptions of Tuffarelli may help explain plaintiffs' discomfort with the ACS investigation, it does not go to the reasonable basis underlying the removal of A.D. and E.D. As then-Judge Mukasey observed in a different context, "It is not a constitutional violation for a public official to be rude." *Van Pelt v. Finn*, 1993 WL 465297, at *8 (S.D.N.Y. Nov. 12, 1993).

Further, in granting defendants' motion for summary judgment, I credit the plaintiffs' chronology concerning Tuffarelli's calls to Sanford and Jackson. According to plaintiffs, Tuffarelli first called Sanford, who instructed him to return to the apartment with police officers to continue the investigation, and was not, at that point, persuaded that emergency removal was necessary. (Pl. 56.1 Resp. ¶ 21.) The two officers arrived, Tuffarelli and Baird revisited the apartment, and Tuffarelli then called Sanford a second time, and again stated that removal was needed. (Pl. 56.1 Resp. ¶ 21.) Only then did Sanford direct Tuffarelli to telephone Jackson and seek Jackson's authorization for removal. (Pl. 56.1 Resp. ¶¶ 21.) Jackson's stated rationale for approving removal was that 1.) injuries from a fall down a flight of stairs may not be immediately visible, 2.) E.D.'s inability to communicate limited ACS's ability to access information, 3.) limited access to E.D.—by schools, medical professionals or ACS—was "troubling," and 4.) children with special needs are at higher risk of abuse than other members of the population. (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶¶ 29; Jackson Dec. ¶¶ 10–11.)

In light of Jackson's explanation, the plaintiffs merely contend, in conclusory fashion, that these rationales did not provide a reasonable basis for removal, and arose from Tuffarelli's "malicious and bad faith misrepresentations" to Jackson. (PL 56.1 Resp. ¶ 29.) If anything, however, the two calls to Sanford, followed by the call to Jackson, indicate an abundance of caution on the part of each of the three individual defendants: Sanford sought greater clarity in understanding the condition of the children, which Tuffarelli provided, prior to Jackson's review of the situation and his approval of the removal. Plaintiffs' conclusion that Sanford's initial hesitation to approve removal indicates bad faith on Tuffarelli's part, as opposed to caution in

effecting removal, is the type of "conjectural, speculative ... suspicion[ ]" that is insufficient to defeat summary judgment. *Contemporary Mission,* 648 F.2d at 107 n. 14.

At the time of removal, there was a reasonable basis for defendants to believe that E.D. and A.D. were in imminent danger of harm, and that removal therefore did not violate plaintiffs' right to procedural due process. As *Wilkinson* noted, "courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between 'difficult alternatives' often need to be made on the basis of limited or conflicting information." 182 F.3d at 105. Here, Tuffarelli's observations amounted to some significant portion of the evidence before him. *Id.* at 108. There is no evidence of unconstitutional conduct such as manufacturing evidence, ignoring exculpatory information, or extra-judicial removal of a child when there is sufficient time to seek court intervention. *See id.* at 104; *Tenenbaum,* 193 F.3d at 596. The plaintiffs may have found Tuffarelli's mannerisms abrasive, but "a mere failure to meet local or professional standards, without more, should not generally be elevated to the status of constitutional violation." *Wilkinson,* 182 F.3d at 106.

True, the Appellate Division ultimately reversed the Family Court's findings of neglect. But, for the purposes of the reasonable-basis test, it is important to note that the Family Court found that E.D. and A.D. had been neglected due to a failure to provide inadequate medical care and also had not been provided with a proper education. (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49; Gantz Dec. Ex. W.) It reached this conclusion in May 2007, after three days of hearings and the testimony of ten witnesses, including Byrd and Demtchenko. (Def. 56.1 ¶ 49; Pl. 56.1 Resp. ¶ 49; Gantz Dec. Ex. W.) At the time that E.D. and A.D. were paroled, which was prior to the Family Court's finding of neglect, the Honorable Sara P. Schechter stated additional concerns about the situation of the Demtchenko residence. She stated in part:

> At this time, I cannot in good conscience keep these children out of the home during the pendency of the balance of this hearing. That is not to say that I do not have serious concerns, and I have addressed those concerns with counsel and in the robing room with all counsel; I certainly do not mean this order to be misconstrued as saying, oh, I don't think there's anything going on here, because that's not the case. However, what I see at this point does not, to my judgment present imminent danger. It does present some very significant problems that need to be addressed, but, I think the imminent danger to the child, that an autistic child being in an unfamiliar setting is more profound than the dangers this home presents at this moment. So I am going to parole the children to the respondents under very close ACS supervision.

(Gantz Dec. Ex. S at 9.) Judge Schechter's findings do not undercut Tuffarelli's observations or the reasonableness of his conclusions on Friday, October 27, which were based on "significant information supporting a finding of abuse." *Wilkinson,* 182 F.3d at 106. The teacher's independent report of suspected abuse was also consistent with Tuffarelli's observations.

The conclusion that the record supports a reasonable basis for removal, and that plaintiffs have failed to raise a triable issue of material fact in support of their claim, is consistent with the holdings of other courts in this Circuit that have confronted similar factual situations. *See, e.g., Park v. City of New York,* 2003 WL 133232, at *12 (S.D.N.Y. Jan. 16, 2003) (no due pro-

cess violation when officials observed bruises on child, child complained of abuse and parent acknowledged leaving child home alone); *Cornejo v. Bell*, 2008 WL 5743934, at *9–10 (E.D.N.Y. May 19, 2008) (due process not violated when ACS received tip of child abuse, parents could not explain injuries and Family Court was closed for the day, rendering it impossible to seek judicial authorization), *aff'd*, 592 F.3d 121 (2d Cir.2010). By way of contrast, a due process violation may arise when officials had adequate opportunity to seek judicial review prior to removal. *Hollenbeck v. Boivert*, 330 F.Supp.2d 324, 332–33 (S.D.N.Y.2004) (complaint successfully alleged that officials had insufficient basis to remove child when evidence showed that injury was the result of a mere accident and "lag of time" existed between investigator visit and subsequent removal).

Defendants have come forward with evidence that, if believed, would entitle them to judgment in their favor. In response, plaintiffs have disputed details of defendants' assertions, but the undisputed balance would not permit a reasonable jury to find in plaintiffs' favor. Because the record does not support a violation of procedural due process, summary judgment is granted in defendants' favor.

C. *Summary Judgment is Granted to Defendants on Plaintiffs' Fourth Amendment Claim.*

 A Fourth Amendment claim in the child-removal context requires an analysis that is nearly identical to the procedural due process claim. Fourth Amendment rights are personal rights that cannot be asserted vicariously, but may be brought on behalf of a child by a parent. *See Tenenbaum*, 193 F.3d at 601 n. 13; *P.C. v. Conn. Dep't of Children and Families*, 662 F.Supp.2d 218, 231 (D.Conn.2009) (as a matter of law, parents do not have Fourth Amendment rights as

to child's removal, and may bring claims only on the child's behalf) (citing *Tenenbaum*). I therefore construe the Complaint's Fourth Amendment claim as being asserted on behalf of A.D. and E.D. by Demtchenko and Byrd.

 The Fourth Amendment prohibits "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing ... the persons or things to be seized." The removal of a child, even on a temporary basis, may constitute a "seizure" for the purpose of the Fourth Amendment's prohibition against unlawful search and seizure. *See Tenenbaum*, 193 F.3d at 602. "[A] Family Court order is probably the equivalent of a warrant for Fourth Amendment purposes." *Nicholson*, 344 F.3d at 176.

*Tenenbaum* analogized seizure in the child-removal context to warrantless-seizure precedent that more commonly arises in the law enforcement setting. *Id.* at 602–05. It held that exigent circumstances permit law enforcement officers to proceed without a warrant in order to protect life or avoid serious injury, and that a similar rationale applies to the removal of a child without a court order or parental consent. *Id.* at 604–05 (quotation marks omitted). *Tenenbaum* concluded as follows:

We hold that where information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed from school before court authorization can reasonably be obtained, the "exigent circumstances" doctrine too permits removal of the child without a warrant equivalent and without parental consent.

Whatever Fourth Amendment analysis is employed, then, it results in a test for

present purposes similar to the procedural due-process standard.

*Id.* at 605; *see also Nicholson,* 344 F.3d at 172 ("there is no Fourth Amendment violation committed by ACS officials carrying out an *ex parte* removal where there was probable cause to believe that there existed facts to merit emergency removal under New York law"); *Shapiro v. Kronfeld,* 2004 WL 2698889, at *17 (S.D.N.Y. Nov. 24, 2004) (the test for identifying a Fourth Amendment violation in a child-removal case "is similar to the procedural due process standard."); *see also P.C.,* 662 F.Supp.2d at 233 ("while the clarity of hindsight" may reveal no immediate risk to removed children, "this does not make defendants' belief on that date unreasonable.").

Defendants have come forward with evidence that, if believed, would entitle them to judgment in their favor. In response, plaintiffs have disputed details of defendants' assertions, but the undisputed portions of the record would not permit a reasonable jury to find in plaintiffs' favor. Because the record does not support claim that defendants violated the Fourth Amendment, summary judgment is granted in defendants' favor.

### D. *Summary Judgment is Granted to Defendants on Plaintiffs' Substantive Due Process Claim.*

■ The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." "Choices about marriage, family life, and the upbringing of children are among associational rights [the Supreme] Court has ranked as of basic importance in our society, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.,* 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (internal citation and quotation marks omitted). A recognized liberty interest inheres in a parent's custody of a child. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (parents have a "fundamental liberty interest . . . in the care, custody, and management of their child . . ."); *accord Wilkinson,* 182 F.3d at 103; *Tenenbaum,* 193 F.3d at 600; *Gottlieb,* 84 F.3d at 518. The interest in familial integrity "does not automatically override the sometimes competing" government interest in protecting children, however, particularly from harm caused by the parents themselves. *Kia P.,* 235 F.3d at 758.

■ A plaintiff seeking to prevail on a claim must establish that the separation from her children was " 'so shocking, arbitrary, and egregious that the Due Process clause would not countenance it even were it accompanied by full procedural protection.' " *Anthony v. City of New York,* 339 F.3d 129, 143 (2d Cir.2003) (quoting *Tenenbaum,* 193 F.3d at 600). Temporary removals "generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." *Nicholson,* 344 at 172: *see also Orlik v. Dutchess County,* 603 F.Supp.2d 632, 646 (S.D.N.Y.2009) ("alleged several-hour long removal . . . pending a judicial determination of whether removal was proper, does not rise to the level of a violation of substantive due process."); *Southerland v. City of New York.* 521 F.Supp.2d 218, 232 (E.D.N.Y.2007) (emergency removal of children, subject to later court review, did not violate substantive due process). The temporary placement of a *child* into *government* custody does " 'not result in [the] parents' wholesale relinquishment of their right to rear their children.' " *Nicholson,* 344 F.3d at 172 (alteration in original) (quoting *Joyner*

*ex rel. Lowry v. Dumpson,* 712 F.2d 770, 778 (2d Cir.1983)).

Here, the temporary removal of A.D. and E.D. does not violate the plaintiffs' substantive due process rights. As previously noted, A.D. and E.D. were removed from the plaintiffs' apartment on a Friday evening, and judicial proceedings commenced in a timely manner on the following Monday. (Def. 56.1 ¶¶ 32, 38; 56.1 Resp. ¶¶ 32, 38.) This temporary removal is not "so shocking, arbitrary, and egregious that the Due Process clause would not countenance it even were it accompanied by full procedural protection." *Anthony,* 339 F.3d at 143.

Defendants have come forward with evidence that, if believed, would entitle them to judgment in their favor. In response to the motion, plaintiffs have disputed some details, but what remains would not permit a reasonable jury to find in plaintiffs' favor. Because the record does not support a violation of substantive due process, summary judgment is granted in defendants' favor.

E. *Summary Judgment is Granted to Defendants on Plaintiffs' First Amendment Claim.*

In addition to alleging violations of the Fourth and Fourteenth Amendments, the Complaint also asserts that the defendants violated plaintiffs' rights under the First Amendment. In a footnote, the defendants observe that "[i]t is unclear what constitutes the basis of plaintiffs' First Amendment claim," and note that familial rights of association are grounded in the Fourteenth Amendment. (Def. Mem. at 5 n. 2.) In opposition to the defendants' summary judgment motion, the plaintiffs fail to address the grounds for their purported First Amendment claim. Similarly, plaintiffs' own motion for summary judgment does not set forth a basis for their First Amendment claim.

Because plaintiffs have not come forth with evidence sufficient for a reasonable jury to find in their favor as to their First Amendment claim, summary judgment is granted to the defendants.

IV. *The Court Declines to Exercise Supplemental Jurisdiction Over the Remaining State Law Claims.*

In addition to their claims asserting violations of the United States Constitution, the plaintiffs also assert three causes of action under New York law, alleging negligence, malicious prosecution and abuse of process. I decline to exercise supplemental jurisdiction over the three remaining state law claims.

Section 1367 of title 28 of the United States Code governs the exercise of supplemental jurisdiction and states in relevant part:

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a). Section 1367(c)(3) states that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction...." Although section 1367(c)(3) is couched in permissive terms, the Second Circuit has made clear that the Court's discretion "is not boundless." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003). In *Valencia,* the Second Circuit held that the district court abused its discretion by exercising jurisdiction over a state-law claim following dismissal of the plaintiffs' federal claims at summary judgment. *Id.* at 306–07. At the time the plaintiffs conceded an

absence of viable federal claims, "most of the anticipated pretrial discovery had been completed," no judicial opinions had issued, and the case was not yet trial-ready. *Id.* at 306. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 305. In deciding whether to exercise jurisdiction over supplemental state-law claims, district courts should balance the values of judicial economy, convenience, fairness, and comity—the *"Cohill* factors." *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York,* 464 F.3d 255, 262 (2d Cir. 2006) (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

The Second Circuit has deemed it proper to retain supplemental jurisdiction over state-law claims in actions that implicate preemption issues, state law claims that remain when federal claims are voluntarily dismissed days before the scheduled start of trial, and state law claims that remain after the district court considered three dispositive motions. *Valencia,* 316 F.3d at 306. *See also Arthur Glick Truck Sales, Inc. v. H.O. Penn Mach. Co.,* 332 F.Supp.2d 584, 586 (S.D.N.Y.2004) (plaintiffs voluntary dismissal of single federal claim warranted remand to state court for lack of supplemental jurisdiction over the remaining state-law claims); *Den Hollander v. Flash Dancers Topless Club,* 340 F.Supp.2d 453, 463 (S.D.N.Y.2004) (dismissing state-law claims following dismissal of RICO claim, and noting that "[w]hile district courts are capable and are bound to apply the state law to claims, '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring them a surer-footed reading of applicable

law.' ") (quoting *New York v. Niagara Mohawk Power Corp.,* 263 F.Supp.2d 650, 670 (W.D.N.Y.2003)).

The Complaint asserts that the Court has federal question jurisdiction over the constitutional claims, with pendent supplemental jurisdiction over state-law claims. (Compl. ¶¶ 3–4.) I have now dismissed the plaintiffs' federal claims. The *Cohill* factors of judicial economy, convenience, fairness and comity weigh against exercising supplemental jurisdiction over claims between New York parties implicating only New York state law.

The plaintiffs' claims for negligence, malicious prosecution and abuse of process are dismissed without prejudice.

### V. *Plaintiffs' Motion for Summary Judgment is Denied.*

 Finally, I briefly and separately address plaintiffs' motion for partial summary judgment. Plaintiffs argue that they are entitled to summary judgment as to constitutional claims against Tuffarelli. Plaintiffs contend that collateral estoppel applies offensively against defendant Tuffarelli, inasmuch as the Family Court ultimately paroled A.D. and E.D. and returned them to the home. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *San Remo Hotel, L.P. v. City & County of San Francisco, Cal.,* 545 U.S. 323, 336 n. 16, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005) (quotation marks omitted). For collateral estoppel purposes, issues are identical "if a different decision in the second suit would necessarily destroy or impair rights or interests established in the first." *In re American Tobacco Co.,* 880 F.2d 1520, 1527 (2d Cir.1989) (applying New York law) (citations omitted).

Here, the Family Court never adjudicated the issue underlying plaintiffs' constitutional claim against Tuffarelli—that is, whether Tuffarelli had a reasonable basis to remove E.D. and A.D.—and no ruling by this Court would necessarily impair the issues adjudicated in Family Court. *Id.; see also Providencia V. v. Schutlze,* 2007 WL 1582996, at *4 (S.D.N.Y. May 31, 2007) (declining to apply collateral estoppel when "[t]he constitutional issues of probable cause and reasonableness with respect to the initial removal were not addressed" in a Family Court order directing a child's return to his parents, "nor was there any issue of personal liability implicated in that proceeding"). In addition, for reasons stated in the above discussion of the *Rooker–Feldman* doctrine, collateral estoppel does not apply in this case. *See Vargas v. City of New York,* 377 F.3d 200, 205 (2d Cir.2004) (observing that *Rooker–Feldman* "is generally applied coextensively with principles of . . . collateral estoppel (issue preclusion)," and evaluating *Rooker–Feldman* issues pursuant to New York collateral estoppel principles).

Plaintiffs' motion for partial summary judgment as to their constitutional claims against Tuffarelli is denied.

CONCLUSION

The defendants' motion for summary judgment is granted. (Docket # 40.)

The plaintiffs' motion for partial summary judgment as to defendant Tuffarelli is denied. (Docket # 49.)

I decline to exercise supplemental jurisdiction over plaintiffs' state-law claims, which are dismissed without prejudice.

The Clerk is directed to enter judgment in favor of the defendants.

SO ORDERED.