07-4449-cv (L), 07-4450-cv (CON)
Southerland v. City of New York

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

# <u>ORDER</u>

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 22nd day of May, two thousand twelve.

- - - - - - - - - - - - - - - - - - - - -X

**SONNY B. SOUTHERLAND, SR., individually and as parent and natural guardian of VENUS SOUTHERLAND, SONNY B. SOUTHERLAND, JR., NATHANIEL SOUTHERLAND, EMMANUEL FELIX, KIAM FELIX, AND ELIZABETH FELIX,**

> **<u>Plaintiffs-Appellants</u>,**

> **-v.-**                                     07-4449-cv (L)

**CITY OF NEW YORK, TIMOTHY WOO, JOHN DOES 1-9,**

> **<u>Defendants-Appellees</u>.**
- - - - - - - - - - - - - - - - - - - - -X

MICHAEL G. O'NEILL, New York, N.Y., <u>for Plaintiffs-Appellants Venus S., Sonny B.S. Jr., Nathaniel S., Emmanuel F., Kiam F., and Elizabeth F.</u>

SONNY B. SOUTHERLAND, Brooklyn, N.Y., <u>Plaintiff-Appellant</u>, <u>pro se</u>.

JULIAN L. KALKSTEIN, City of New York (Michael A. Cardozo, Corporation Counsel; Larry A. Sonnenshein, of counsel), New York, N.Y., <u>for Defendants-Appellees</u>.

Following disposition of this appeal on February 2, 2012, and prior to the amended disposition on May 14, 2012, an active judge of the Court requested a poll on whether to rehear the case <u>in banc</u>.  A poll having been conducted and there being no majority favoring <u>in banc</u> review, rehearing <u>in banc</u> is hereby **DENIED**.

Judge Raggi dissents in an opinion joined by Chief Judge Jacobs and Judges Cabranes, Wesley, and Livingston.

Chief Judge Jacobs dissents in an opinion joined by Judges Cabranes, Raggi, Wesley, and Livingston.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

REENA RAGGI, Circuit Judge, with whom Chief Judge JACOBS, Judge CABRANES, Judge WESLEY, and Judge LIVINGSTON join, dissenting from the denial of rehearing en banc:

In 1998, after a five-day trial in New York State Family Court, Sonny Southerland was found to have abused his seven children so severely—sexually and corporally—as to warrant denying him custody for seven years. This ruling and the findings supporting it have never been disturbed. See In re Ciara M., 273 A.D.2d 312, 314, 708 N.Y.S.2d 717, 719 (2d Dep't) (upholding abuse findings and affirming orders denying custody), leave to appeal denied, 95 N.Y.2d 767, 717 N.Y.S.2d 547 (2000). A panel of this court concludes that Southerland can nevertheless invoke 42 U.S.C. § 1983 to demand money damages from Timothy Woo, the caseworker who rescued the Southerland children from their father's abuse. The panel further concludes that Southerland's abused children can also maintain such a damages action against their rescuer.

Essentially, plaintiffs complain that Woo—who had been assigned to investigate a report that Southerland's teenage daughter Ciara might be suicidal and that her father was indifferent to her need for care—entered the Southerland home pursuant to a warrant that was not supported by probable cause. See U.S. Const. amend. IV. They further contend that Woo removed Southerland's six other children from the home without evidence of exigency, thereby effecting an unreasonable seizure and a deprivation of plaintiffs' liberty interest in a continuing family relationship without due process. Id. amend. IV, XIV. With respect to the removal claim, plaintiffs do not contend—nor could they in light of the Family Court ruling—that Southerland did not, in fact, pose an exigent threat to his children's safety. They contend only that Woo was not yet aware that the threat was exigent.

1

By even plaintiffs' account, it did not take long for Woo to gain such awareness. Within four days of effecting the challenged removal, Woo learned and reported to the Family Court that "Southerland has been sexually abusing his daughter Ciara Manning (age 16) since she was eight years old. On numerous occasions over the past nine years respond[e]nt S[o]utherland has had sexual intercourse with Ciara and would threaten to kill Ciara if she told anyone." Ex. D to Silverberg Decl. in Supp. of Summ. J. at 5, Southerland v. City of N.Y., No. 99-CV-3329 (E.D.N.Y. Sept. 18, 2006) ("Silverberg Decl."), ECF No. 168-7. Further, before the month was out, Woo learned and reported to the Family Court that the six children removed from the Southerland home—then ages three to nine—had revealed that their father hit them "with broom sticks, exercise equipment and other objects causing welts and bruises," and had punished the children for "tak[ing] food from the refrigerator without permission" by hitting them "with various objects." Ex. E to Silverberg Decl. at 6, ECF No. 168-8. The state court's custody determination makes clear that the Southerland children would have continued to experience such abuse but for the challenged removal for which they and their abusive father now demand compensation from Woo.[1]

---

[1] Plaintiffs cannot frame their § 1983 claims in any way that challenges the validity of the state court custody decision or the findings of fact supporting that decision. See Rooker v. Fidelity Trust Co., 263 U.S. 413, 415–16 (1923) (forbidding state court losers from complaining in federal court of injuries caused by state court judgments); accord Skinner v. Switzer, 131 S. Ct. 1289, 1297 (2011); Green v. Mattingly, 585 F.3d 97, 103 (2d Cir. 2009) (discussing when Rooker-Feldman doctrine would likely bar challenge to Family Court adjudication); see also La Fleur v. Whitman, 300 F.3d 256, 271–75 (2d Cir. 2002) (applying New York collateral estoppel rule to preclude relitigation of factual issues in federal court). Nevertheless, they maintain that they can recover money damages for Woo's premature interruption of the adjudicated abuse of which he was not yet fully aware.

The district court sensibly dismissed this action, awarding summary judgment in favor of Woo on the ground of qualified immunity. See Southerland v. City of N.Y., 521 F. Supp. 2d 218, 231–32 (E.D.N.Y. 2007) (Sifton, *J.*). In reversing that judgment, the panel concludes both that (1) the constitutional rights asserted here by Southerland and his abused children were clearly established in the circumstances confronting Woo at the time of his challenged actions, see Southerland v. City of N.Y., --- F.3d ----, 2012 WL 1662981, at *18–19, *27 (2d Cir. 2012); and (2) the record reveals disputed issues of fact that a reasonable jury could resolve in plaintiffs' favor, see id. at *12–17, *19, *28. I respectfully disagree with both conclusions for reasons that merit en banc review. These reasons can be briefly summarized as follows.

First, the panel concludes that Woo lacked probable cause to seek Ciara Manning, the reported neglected child, in Southerland's home because Woo had been told that she might have run away. See id. at *13–14. This misperceives the probable cause requirement, which neither demands certainty nor is defeated by possibilities. In the context of child welfare investigations, there is always probable cause to look for an at-risk child in the home of the custodial parent, at least absent conclusive evidence that the child is in fact somewhere else, which was not the case here. To the extent that five judges of this court hold that view of probable cause, it can hardly be said that no reasonable child welfare worker could have thought likewise. Thus, Woo is entitled to qualified immunity on plaintiffs' Fourth Amendment challenge to his entry into the Southerland home.

Second, in allowing an adjudicated abusive father and the children he abused to sue a caseworker for prematurely halting the abuse, the panel extends our due process precedent in a way that the court should reject en banc. The cases cited by the panel as recognizing a parent's right to sue for due process violations by child welfare authorities all involved circumstances in which suspicions of abuse or neglect eventually proved unfounded, see Kia P. v. McIntyre, 235 F.3d 749, 751 (2d Cir. 2000); Tenenbaum v. Williams, 193 F.3d 581, 587 (2d Cir. 1999); Hurlman v. Rice, 927 F.2d 74, 76 (2d Cir. 1991), or no state judicial process was ever afforded to confirm such suspicions, see Duchesne v. Sugarman, 566 F.2d 817, 823 (2d Cir. 1977). None involved due process claims by parents adjudicated to have abused their children, or by the children who were victims of such abuse. For the same reasons that the law does not permit a convicted defendant to challenge the sufficiency of the evidence supporting his arrest, see Cameron v. Fogarty, 806 F.2d 380, 388–89 (2d Cir. 1986), it should not permit an adjudicated abusive parent, or the children he abused, to sue a rescuing caseworker on a theory that the caseworker prematurely intervened. Recognizing a viable claim for money damages in such circumstances risks bringing the law into disrepute. Further, it endangers future abuse victims by unnecessarily deterring caseworkers from promptly intervening for fear of being liable in money damages, not only in cases where no parental abuse or neglect is established but also in cases where courts conclusively determine that it is.

Thus, the scope and parameter of the constitutional rights at issue in the context of state adjudications of parental abuse raise questions of exceptional importance warranting

4

en banc review.  See Fed. R. App. P. 35(a)(2).  Insofar as a majority of the active members of this court decline to undertake such review, I respectfully dissent from the denial of rehearing en banc.

* * *

1.    Qualified Immunity

To allow government officials to perform discretionary duties without fear of undue interference or threat of potentially disabling liability, the law affords them qualified immunity from suits for money damages, provided that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware.  See Harlow v. Fitzgerald, 457 U.S. 800, 806, 818 (1982); accord Filarsky v. Delia, 132 S. Ct. 1657, 1665 (2012) (recognizing qualified immunity doctrine to serve vital purpose of "[e]nsuring that those who serve the government do so with the decisiveness and the judgment required by the public good" (internal quotation marks omitted)).  Such immunity has been recognized to provide a broad shield, protecting "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986); accord Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011).

A threshold question to any immunity claim is whether the facts, viewed in the light most favorable to the plaintiff, show that a statutory or constitutional right was violated.  If that question can clearly be answered no, there is simply "no necessity for further inquiries concerning qualified immunity."  Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); accord Walczyk v. Rio,

5

496 F.3d 139, 154 (2d Cir. 2007) (collecting cases explaining that resolution of threshold question favorably to defendant "moots" further qualified immunity inquiry). If the answer is yes, or at least not clearly no, see Pearson v. Callahan, 555 U.S. at 237, the pertinent qualified immunity inquiry is whether the right was clearly established at the time of the defendant's actions, see Ashcroft v. al-Kidd, 131 S. Ct. at 2080; Walczyk v. Rio, 496 F.3d at 154. As the Supreme Court has emphasized, this second question is not answered by reference to how courts or lawyers might have understood the state of the law. Rather, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. at 202; see Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012). Thus, even if the right at issue "was clearly established in certain respects," a state actor "is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." Walcyzk v. Rio, 496 F.3d at 154 (quoting Malley v. Briggs, 475 U.S. at 341).

Applying these principles to this case, the district court correctly awarded Woo judgment on the ground of qualified immunity.

2.    Entry into the Southerland Home: Probable Cause Claim

On June 9, 1997, having procured a court order under New York Family Court Act § 1034(2) (McKinney 1997), Timothy Woo entered the Southerland home in order to conduct an investigation mandated by New York Social Services Law § 424. The latter

statute requires child welfare authorities, upon receipt of a complaint of possible child abuse or neglect, "to commence, within twenty-four hours, an appropriate investigation which shall include an evaluation of the environment of the child named in the report and any other children in the same home and a determination of the risk to such children if they continue to remain in the existing home environment." N.Y. Soc. Serv. Law § 424(6)(a). Meanwhile, New York Family Court Act § 1034(2) permits courts to authorize a home entry even without parental consent upon finding "probable cause to believe that an abused or neglected child may be found on premises." In procuring a § 1034(2) warrant to enter the Southerland home, Woo submitted an affidavit stating that he believed that named children in the residence were neglected or abused because (1) one child, sixteen-year-old Ciara Manning, had "tried to kill herself by swallowing non-toxic paint," and her custodial father, Southerland, had not obtained any treatment for her;[2] and (2) Southerland had refused to allow child welfare workers into his home to speak to other named children on the premises. Southerland v. City of N.Y., 2012 WL 1662981, at *4 n.5 (quoting Woo application in entirety).

---

[2] See N.Y. Fam. Ct. Act § 1012(f)(i) (stating that child is neglected if her "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of h[er] parent or other person legally responsible for h[er] care to exercise a minimum degree of care"); id. § 1012(f)(i)(A) (recognizing minimum care to include provision of necessary medical care). Insofar as Southerland attempts to disavow responsibility for Ciara's neglect by claiming that he periodically sought state assistance in controlling the child, see Southerland v. City of N.Y., 2012 WL 1662981, at *14, the assertion is beside the point. Such action might mitigate Southerland's culpability for any neglect, but it does not alter the probability that Ciara was a neglected child at the time of the challenged entry, when Southerland, not the State of New York, was responsible for her care.

7

The fact that Woo's challenged entry was pursuant to a court order gives rise to "a presumption that it was objectively reasonable for [him] to believe" that the entry "was supported by probable cause," thereby affording him qualified immunity from suit for a purported violation of the Fourth Amendment. Martinez v. City of Schenectady, 115 F.3d 111, 115 (2d Cir. 1997); see Messerschmidt v. Millender, 132 S. Ct. at 1245 ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in objective good faith." (internal quotation marks omitted)); Walczyk v. Rio, 496 F.3d at 155–56. To overcome this presumption, plaintiffs were obliged to make "a substantial preliminary showing" (1) that Woo "knowingly and intentionally, or with reckless disregard for the truth," made false statements or material omissions to secure the entry order; and (2) that the allegedly false statements or material omissions were "necessary to the finding of probable cause." Franks v. Delaware, 438 U.S. 154, 155–56 (1978); accord Walcyzk v. Rio, 496 F.3d at 155–56; see Martinez v. City of Schenectady, 115 F.3d at 115.

Toward that end, plaintiffs alleged that Woo's § 1034(2) application contained a number of knowing or reckless misstatements and omissions that defeated probable cause. In rejecting this claim, the district court relied on the corrected affidavit doctrine, which affords qualified immunity if, when false material is set aside, or omitted information is supplied, "the corrected affidavit would have supported a" reasonable officer's belief that probable cause existed. Martinez v. City of Schenectady, 115 F.3d at 115 (internal quotation

8

marks omitted); accord Walczyk v. Rio, 496 F.3d at 158. Reversing, the panel reasons that insofar as Woo's § 1034(2) application identified Ciara Manning as the neglected or abused child to be sought in the Southerland home, the required probable cause to believe that she would be found "on premises" was defeated if Woo's affidavit were corrected to include the omitted facts that (1) school reports indicated that Ciara might be staying outside the Southerland home, over the opposition of her father; and (2) Southerland had told Woo that Ciara was a runaway not living at home. See Southerland v. City of N.Y., 2012 WL 1662981, at *13–14.

The conclusion that these corrections defeat probable cause to think that Ciara Manning might be found in the Southerland home is wrong as a matter of law. While probable cause requires more than "mere suspicion," Mallory v. United States, 354 U.S. 449, 454 (1957), it does not demand "hard certainties," Illinois v. Gates, 462 U.S. 213, 231 (1983). Indeed, probable cause does not even require that something be more likely so than not so, the preponderance standard of proof. See id. at 235 (cautioning that "[f]inely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place" in probable cause determination). Rather, probable cause is a "fluid concept," concerned simply with "probabilities." Id. at 232. In assessing what is probable, a judicial officer must look to "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Id. at 231 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); accord Walczyk v. Rio, 496 F.3d at 156–57.

9

With these principles in mind, it is important to note exactly what New York Family Court Act § 1034(2) requires be probable to authorize entry into a home, i.e., that "an abused or neglected child may be found on premises." N.Y. Fam. Ct. Act § 1034(2) (emphasis added). In short, it need not be probable that an abused or neglected child "will be found" on the premises; it need only be probable that such a child "may be found" there. Among the various probabilities required by law to justify searches or seizures serving different purposes, § 1034(2)'s "may be found" requirement is not a particularly demanding one. See United States v. Abu-Jihaad, 630 F.3d 102, 121–29 (2d Cir. 2010) (contrasting probable cause requirements for criminal and national security surveillance and recognizing flexibility of Constitution's warrant requirement, such that different probable cause standards may be compatible with Fourth Amendment in light of different purposes and practical considerations at issue). Indeed, plaintiffs do not dispute that a "may be found" requirement is consistent with the purpose being pursued, which in the case of a § 1034(2) entry is not prosecutorial but protective, i.e., promptly to locate and assist an at-risk child. See generally Nicholson v. Scoppetta, 344 F.3d 154, 158 (2d Cir. 2003) ("Few matters are closer to the core of a State's essential function than the protection of its children against those who would, intentionally or not, do them harm."). Thus, while an entry into a criminal target's home to execute a warrant for his arrest requires a reasonable belief that the suspect "is within," Payton v. New York, 445 U.S. 573, 603 (1980); see United States v. Lauter, 57 F.3d 212, 214 (2d Cir. 1995), an entry into premises to locate a neglected or abused child requires a probability only that the child "may be found" on those premises.

10

In identifying the places where a neglected or abused child "may be found," this court should clarify that there is always probable cause to think that a child may be found at her legal residence, i.e., the residence of her custodial parent, at least absent conclusive evidence to the contrary. Indeed, it is the first place that any "reasonable and prudent" person would look for a child. Illinois v. Gates, 462 U.S. at 231.

The addition of the omitted information to Woo's affidavit warrants no different conclusion. School reports that Ciara Manning might be staying some place other than her legal residence referenced, at most, a possibility, which is not enough to defeat the probability that the child nevertheless "may be found" at her residence. Cf. United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (holding that possible "innocent explanation" for facts alleged "does not negate probable cause" to infer criminality from those facts). As for Southerland's characterization of his daughter as a runaway, the law does not require that such a statement be credited. See generally Robison v. Via, 821 F.2d 913, 922 (2d Cir. 1987) (stating that officials need not defer action merely because parent protests innocence or promises future protection if evidence indicates parent's past unwillingness or inability to assure child's safety and well-being). Any different conclusion would yield the perverse result of an abusive parent having only to deny a child's presence on the premises to preclude a caseworker from obtaining or executing a warrant to investigate reports of abuse. Precisely to avoid the risk that any such argument could be derived from the panel opinion, the court needs to clarify en banc that there is always probable cause to think that an at-risk child "may be found" at the residence of her custodial parent absent conclusive evidence that she is in

11

fact somewhere else.[3]

With that understanding of the law, a corrected affidavit in this case "discloses no genuine dispute" as to the existence of probable cause to enter the Southerland home to look for the identified neglected child, Ciara Manning. Walczyk v. Rio, 496 F.3d at 158 (emphasis in original). In any event, because five judges of this court hold that view of the law, the panel can hardly maintain that no "officer[] of reasonable competence" could have reached the same conclusion. Malley v. Briggs, 475 U.S. at 341; Walczyk v. Rio, 496 F.3d at 154 (collecting cases). Thus, Woo is plainly entitled to qualified immunity from plaintiffs' Fourth Amendment illegal entry claims.[4]

---

[3] The panel suggests that Woo's deposition testimony indicates that, at the time he entered the Southerland home, he himself did not think Ciara Manning would be found on the premises. See Southerland v. City of N.Y., 2012 WL 1662981, at *16. First, the panel makes this observation only in explaining why a jury could find that Woo's purported misstatements and omissions were knowing and reckless. See id. at *15. That subjective inquiry should not be confused with the objective inquiry into whether a corrected affidavit would have supported probable cause. Indeed, because probable cause is an objective standard, its existence can neither be established nor undermined by the subjective beliefs of a particular officer. See Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 139 (2d Cir. 2010).

Second, even as a matter of Woo's subjective belief, the deposition exchange does not support a reasonable inference that Woo knew for a fact that Ciara Manning would not be found in the Southerland home. Nothing in the record indicates that when Woo entered the Southerland home he knew anything more about Ciara Manning's whereabouts than what school officials or Southerland had told him, i.e., that Ciara might be living elsewhere or have run away. For the reasons stated in text, such statements are insufficient to defeat the probability that an at-risk child whose exact whereabouts are unknown nevertheless "may be found" at her legal residence.

[4] Indeed, a reasonable caseworker could well have concluded that the facts in a corrected affidavit established a probability that other abused or neglected children "may be found" on the Southerland premises. It is undisputed that other children were then residing in the Southerland home. The affidavit's misstatement of their names—using the names of

12

3. Removal of the Southerland Children: Due Process and Unreasonable Seizure Claims

The panel concludes that at the time of the challenged removal, it was clearly established under both the Due Process Clause and the Fourth Amendment that, absent exigent circumstances, Woo could not remove the Southerland children from their father's home without a court removal order. See Southerland v. City of N.Y., 2012 WL 1662981, at *18. To the extent the right at stake is procedural due process, the panel references dual underlying liberty interests, one, by parents, "'in the care, custody and management of their children,'" id. at *10 (quoting Tenenbaum v. Williams, 193 F.3d at 593); and the other, by children, "'in not being dislocated from the emotional attachments that derive from the intimacy of daily family association,'" id. (quoting Kia P. v. McIntyre, 667 F.3d at 759).

The problem with the panel's due process analysis, as I noted at the outset of this opinion, is that it derives entirely from cases in which the challenged intrusion into family

Ciara Manning's step-siblings residing with her mother rather than the names of her step-siblings residing with Southerland, see Southerland v. City of N.Y., 2012 WL 1662981, at *13—is immaterial to that essential fact. Further, those children shared the same custodial residence as Ciara, a child who had expressed thoughts of suicide, swallowed a can of paint at school, and purportedly run away from home. This is sufficient to permit a reasonable caseworker to think that something was amiss in the Southerland home that could affect any child living there. Add to these facts the custodial father's "fail[ure] to follow through w[ith] mental health referrals" for the suicidal child, id. at *2 (quoting Child Protective Services intake report), and his apparent ignorance as to that child's whereabouts, and the probability increases that what is amiss is indicative of parental neglect (if not yet abuse) that would extend to any child in the father's care. In such circumstances, even if Southerland had not expressly "refused" Woo entry into the home, id. at *4 n.5, Southerland's purported inability to identify a convenient time for a home visit would reasonably be viewed as stalling, reinforcing the probability that other children who were neglected—or worse—would be found in his home. I do not pursue the point further, however, because my main concern with the panel decision pertains to its determination that a corrected affidavit failed to state probable cause to believe that Ciara Manning "may be found" in the Southerland home.

13

liberty was based on suspicions of abuse or neglect that were eventually shown to be unfounded, see Kia P. v. McIntyre, 235 F.3d at 71; Tenenbaum v. Williams, 193 F.3d at 587; Hurlman v. Rice, 927 F.2d at 76, or at least were never confirmed in a state judicial proceeding, see Duchesne v. Sugarman, 566 F.2d at 823. In each of these cases, parents and children who had maintained a recognizable family bond were allowed to sue for intrusions that allegedly violated their procedural due process rights. The panel cites to no case, however, in which an adjudicated abusive parent, or the children he abused, have been permitted to pursue claims that officials who stopped the abuse did so in violation of procedural due process.[5] Nor does the panel explain why the cited precedent should apply equally in such circumstances. In fact, it should not.

When, as here, a state court adjudicates a parent to have been so abusive of his children as to deny him further custody, it effectively finds that the parent, by his abuse, has himself severed the familial bond that was the source of any liberty interest for which he and his children might claim procedural due process rights. Thus, it is not the Family Court's abuse determination that extinguished any liberty interest these plaintiffs may once have derived from a common family bond but, rather, Southerland's actual abuse that did so. For

---

[5] In Nicholson v. Scoppetta, 344 F.3d 154, the class of plaintiffs raising a due process challenge to the ex parte removal of children from the custody of a battered parent was broad enough to include parents challenging removals approved by New York courts, see id. at 162 n.4. This court did not need to reach, let alone decide, whether such parents could maintain a due process action because, on certified questions, the New York Court of Appeals effectively resolved the case favorably to plaintiffs through its interpretation of the term "neglected child" in New York Family Court Act § 1012(f), (h). See Nicholson v. Scoppetta, 3 N.Y.3d 357, 367–72, 787 N.Y.S.2d 196, 200–03 (2004).

14

this reason, I would conclude that an adjudicated abusive parent, such as Southerland, cannot sue the caseworker who rescued children from further abuse on either substantive or procedural due process grounds. To hold otherwise would imply that an abusive parent, or abused children, have a liberty interest in continued abuse.[6]

The conclusion here urged would foreclose due process removal claims against child welfare workers in only a small category of cases: those in which a parent has been adjudicated so abusive or neglectful as to be denied custody. The conclusion finds an analogy in our precedent holding that criminal defendants, once convicted, will not be heard to challenge whether their arrest was supported by probable cause to believe they had committed the crime of conviction. See Cameron v. Fogarty, 806 F.2d at 388–89. A number of our sister circuits have similarly ruled, citing favorably to Cameron. See Howard v. Dickerson, 34 F.3d 978, 981 n.2 (10th Cir. 1994); Hoffman v. Moss, 929 F.2d 692 (Table), 1991 WL 41503, at *1 (4th Cir. 1991) (unpublished opinion); Malady v. Crunk, 902 F.2d 10, 11 (8th Cir. 1990); Walker v. Schaeffer, 854 F.2d 138, 143 (6th Cir. 1988); see also King v. Goldsmith, 897 F.2d 885, 886 (7th Cir. 1990) (assuming, without deciding, that Cameron was correctly decided). But see Rose v. Bartle, 871 F.2d 331, 351 (3d Cir. 1989) (noting, in dictum, doubts as to "policy determinations underlying Cameron"); Brumfield v. Jones, 849 F.2d 152, 155 n.4 (5th Cir. 1988) (noting, without resolving, possible tension between Cameron and Brown v. Edwards, 721 F.2d 1442, 1447–48 & n.8 (5th Cir. 1984)).

---

[6] The panel recognizes an open legal question as to whether an abusive parent or abused child can pursue a substantive due process claim under such circumstances. See Southerland v. City of N.Y., 2012 WL 1662981, at *6 n.9.

15

Cameron itself derived from City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981), in which the Supreme Court recognized that Congress, in enacting § 1983, "expressed no intention to do away with the immunities afforded state officials at common law." Id. at 258; see Filarsky v. Delia, 132 S. Ct. at 1661–62. The common law—with common sense—had long recognized that once guilt is proved, "the injury" to a defendant's personal liberty "caused solely by prematurity of arrest is, of itself, insubstantial," and therefore not legally cognizable. Cameron v. Fogarty, 806 F.2d at 388.

Common law had no occasion to apply this principle to child removal proceedings, a legal innovation arising largely in the nineteenth century. See Naomi Cahn, Perfect Substitutes or the Real Thing?, 52 Duke L.J. 1077, 1090–91 (2003) (dating state removal of abused and neglected children in the United States to late nineteenth century); Developments in the Law: The Constitution and the Family, 93 Harv. L. Rev. 1156, 1221–22 (1980) (recognizing that by early nineteenth century, some English chancery courts exercised parens patriae power to remove children from custody of abusive or neglectful parents). Nevertheless, Cameron's reasoning and the common law defense of conviction apply with equal force to child custody determinations. Once a parent is found guilty of abuse and neglect serious enough to warrant a court denial of custody, any "injury caused solely by prematurity of [the removal of his children] is, of itself, insubstantial." Cameron v. Fogarty, 806 F.2d at 388.[7]

---

[7] Cameron further reasoned that the availability of the exclusionary rule in criminal proceedings "lessens the need for § 1983 actions as a deterrent to the making of arrests on less than probable cause." Cameron v. Fogarty, 806 F.2d at 388. Although the exclusionary

Indeed, the injury of premature removal to an abusive parent may be less substantial than the injury of premature arrest to a convicted felon. While a felon's interest in his own liberty is exclusive to himself, a parent's liberty interest in a family relationship is shared with his children and based on an expectation of parental care, not abuse. Thus, an adjudicated abusive parent's claimed liberty interest in continuing an abusive relationship with his children is certainly de minimis, if not non-existent. The same conclusion obtains with respect to abused children claiming any liberty interest in remaining in what has been adjudicated to have been an abusive relationship.

This ground for affirming the district court's grant of summary judgment on plaintiffs' due process claim would extend Cameron, a matter that merits careful consideration. But it would be far worse to conclude, as the panel does without any consideration of Cameron's reasoning, that adjudicated abusive parents and the children they abused can maintain constitutional claims against child welfare workers for prematurely stopping the abuse. Although defendants themselves did not raise a Cameron-based objection to suit, a court may affirm summary judgment for any reason supported in the record. See Lee v. Kemna, 534 U.S. 362, 391 (2002) ("[I]t is well settled that an appellate tribunal may affirm a trial court's judgment on any ground supported by the record."); 10 Ellicott Square Court Corp. v.

rule appears not to be available in New York child removal proceedings, see In re Diane P., 110 A.D.2d 354, 356, 494 N.Y.S.2d 881, 883 (2d Dep't 1985), it was also not available in proceedings at common law, see United States v. Blue, 384 U.S. 251, 255 (1966) (noting that "general common-law practice [wa]s to admit evidence despite its illegal origins"). If the deterrent effect of the exclusionary rule in criminal proceedings did not inform the development of the common law defense of conviction, it would surely be irrelevant to child custody proceedings.

17

Mountain Valley Indem. Co., 634 F.3d 112, 125 (2d Cir. 2011). Such an affirmance is particularly warranted where the challenged judgment is based on qualified immunity, the very purpose of which is to "permit the defeat of insubstantial claims without resort to trial." Harlow v. Fitzgerald, 457 U.S. at 813; accord Jenkins v. City of N.Y., 478 F.3d 76, 87 n.9 (2d Cir. 2007).

No different conclusion should obtain because the Southerland children also cast their removal as an unreasonable seizure under the Fourth Amendment. The panel assumes that the children could persuade a reasonable jury that it was constitutionally unreasonable for Woo to remove them from the Southerland home without a court order in the absence of evidence that they were in imminent danger of harm on those premises. See Southerland v. City of N.Y., 2012 WL 1662981, at *28.[8] But once the Family Court, after a full trial, determined that the children were at risk of such harm in their father's custody, thereby precluding their return, any Fourth Amendment injury "caused solely by prematurity of [the removal] is, of itself, insubstantial" and, therefore, should not be recognized at law. Cameron v. Fogarty, 806 F.2d at 388. In short, once a home environment is adjudicated to have been abusive, no responsible society would accept as objectively reasonable children's claims that they had a cognizable constitutional right not to be prematurely removed from the premises. Cf. California v. Greenwood, 486 U.S. 35, 39 (1988) (collecting cases recognizing that

---

[8] In 1999, i.e., after the removal here at issue, this court clarified that the imminent danger standard was not satisfied if there was "reasonable time consistent with the safety of the child to obtain a judicial order" before effecting the removal. Tenenbaum v. Williams, 193 F.3d at 596.

18

Fourth Amendment protects only subjective expectations of privacy that "society accepts as objectively reasonable").

Even if plaintiffs could state a cognizable constitutional claim under either the Fourth or Fourteenth Amendment with respect to the children's removal—which they cannot—the qualified immunity question would not be whether a reasonable jury could conclude that the children were not at imminent risk of harm but, rather, whether a reasonable caseworker in Woo's position could have concluded that they were. See Messerschmidt v. Millender, 132 S. Ct. at 1246; Malley v. Briggs, 475 U.S. at 341; Walczyk v. Rio, 496 F.3d at 154 (requiring assessment of qualified immunity in "particular factual context" rather than in abstract). Even setting aside the considerable evidence of neglect that Woo says he confronted upon entering the Southerland home and that Southerland disputes, see Southerland v. City of N.Y., 2012 WL 1662981, at *4, some caseworkers of reasonable competence could conclude from the otherwise undisputed evidence that one or more of the Southerland children were at risk of imminent harm in their father's custody.

As already noted, before entering Southerland's home, caseworkers knew from school counselors that one of Southerland's children, Ciara, had expressed thoughts of suicide and engaged in self-destructive behavior. Whatever the source of Ciara's troubles, Southerland had not secured care for her and was, in fact, dismissive of her need for care. See id. at 9. To the extent Southerland sought to excuse his neglect by claiming that Ciara had left home, this cannot alter the fact that caseworkers were looking for an at-risk child who was in Southerland's legal custody. That the custodial parent purported not to know the

19

whereabouts of such a child would heighten, not minimize, a reasonable caseworker's concern as to Southerland's ability to care for children in his custody. That concern would be magnified, moreover, when, upon entry into the Southerland home, caseworkers found a child on the premises, nine-year-old Venus Southerland, with an untreated puncture wound to her foot from stepping on a nail, and saw no sign that Southerland planned to secure the treatment necessary to protect the child against tetanus. See Ex. D to Silverberg Decl. at 6, ECF No. 168-7. In these circumstances, and in the absence of clearly established law to the contrary, reasonable caseworkers could certainly have viewed Venus as facing imminent serious harm if she was not removed from the premises and promptly afforded medical care. See Messerschmidt v. Millender, 132 S. Ct. at 1245; Malley v. Briggs, 475 U.S. at 341. Thus, Woo is at a minimum entitled to qualified immunity for removing Venus from Southerland's home.

As for Woo's removal of the other Southerland children, this court appears never to have ruled as to whether the risk of imminent harm required to effect a warrantless removal is child-specific. We have provided no guidance to a caseworker who discovers one injured, malnourished, or severely beaten child in need of immediate care as to whether (1) he can effect a warrantless removal of all children found in the same household, or (2) he can remove only the one child and must leave other children behind. Tenenbaum might be understood to instruct caseworkers not to attempt to make such decisions if there is time to seek judicial authorization. See Tenenbaum v. Williams, 193 F.3d at 596. But Tenenbaum was not decided at the time of the removal at issue and, even now, it does not tell

caseworkers who do not have time to secure judicial authorization what removal decisions will be lawful and unlawful with respect to the removal of a number of children when a risk of imminent harm has been identified as to one.

Thus, in June 1997, when Woo removed the Southerland children from their father's home, it was possible for "officers of reasonable competence" to "disagree" as to whether the discovery that Venus Southerland was at risk of serious imminent harm unless removed for prompt medical treatment sufficed to support the warrantless removal of all children in Southerland's home. Malley v. Briggs, 475 U.S. at 341; see Walcyzk v. Rio, 496 F.3d at 154. In the face of such possible reasonable disagreement—that is, in the absence of a clearly established statutory or constitutional rule of which a reasonable caseworker would have been aware, see Harlow v. Fitzgerald, 457 U.S. at 818—Woo is entitled to qualified immunity even from cognizable claims.

This is, however, a secondary point. For the reasons stated, the court should conclude that plaintiffs state no cognizable due process or Fourth Amendment claims in connection with the challenged removal. By analogy to Cameron v. Fogarty, 806 F.2d at 388–89, the court should rule that an adjudicated abusive father and the children he abused cannot seek damages from a child welfare worker for prematurely removing the children from the abusive home.

* * *

By refusing to convene en banc, a majority of this court, no less than the panel itself, tells a child welfare worker that he may have to pay money damages to an adjudicated

21

abusive father for rescuing children from his abusive custody. Further, the court tells the worker that he may also have to pay damages to the abused children he rescued on some theory that the caseworker did not yet appreciate that the circumstances were exigent—though, in fact, they were. Such possible judgments are exactly what the doctrine of qualified immunity is intended to protect against.

Rather than allow this case to go forward, this court should clarify two principles of law: (1) there is always probable cause to look for an at-risk child in the home of his or her custodial parent, at least absent conclusive evidence to the contrary; and (2) once a parent has been adjudicated to have so abused and neglected his children as to be denied custody, neither the adjudicated abusive parent nor the children he abused can sue the caseworker who effected the initial removal for money damages based on due process or Fourth Amendment claims that the removal was premature. With these principles clarified, there is no question that the defendant caseworker, Timothy Woo, is entitled to summary judgment on the ground of qualified immunity. Accordingly, I respectfully disagree with the panel decision to reverse the award of summary judgment in this case, and I dissent from the court's decision not to review that reversal en banc.

DENNIS JACOBS, <u>Chief Judge</u>, with whom Judge CABRANES, Judge RAGGI, Judge WESLEY, and Judge LIVINGSTON join, dissenting from the denial of rehearing <u>in banc</u>:

I concur entirely in Judge Raggi's dissenting opinion. I dissent separately to make some additional points.

**I**

Under Section 1983, personal liability may not be imposed on a government actor unless [1] his conduct violated "clearly established constitutional rights" and [2] it would have been unreasonable for him to have believed otherwise. <u>Holcomb v. Lykens</u>, 337 F.3d 217, 220 (2d Cir. 2003) (quoting <u>Weyant v. Okst</u>, 101 F.3d 845, 857 (2d Cir. 1996)). Liability is precluded if government actors "of reasonable competence could disagree on the legality of the action at issue in its particular factual context." <u>Manganiello v. City of N.Y.</u>, 612 F.3d 149, 165 (2d Cir. 2010) (internal quotation mark omitted). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks omitted).

1

It is easy to demonstrate that the panel opinion has jumped the rails. Not only could other reasonably competent child welfare workers conclude (as Mr. Woo did) that the Southerland household constituted an "emergency," but Mr. Woo's supervisor reached that very conclusion in this very instance. See Southerland v. City of N.Y., Nos. 07-4449-cv (L), 07-4450-cv (CON), 2012 WL 1662981, at *4 (2d Cir. May 14, 2012) (recounting that Mr. Woo applied for an order to enter the Southerland apartment "at the direction of [his] supervisor" and that, based on Mr. Woo's observations inside the apartment, "[Mr.] Woo and his supervisor concluded that the children's safety was threatened, and [Mr. Woo's supervisor] directed [Mr.] Woo to remove the children from the home"); see also Messerschmidt v. Millender, 132 S. Ct. 1235, 1250 (2012) (that an officer obtained the approval of a superior before applying for a warrant "is certainly pertinent in assessing whether [he] could have held a reasonable belief that the warrant was supported by probable cause"). And the Family Court would not have taken the children from Southerland unless a hearing confirmed Mr. Woo's professional judgment that the conditions created by Southerland were unsafe for children. See In re Ciara M.,

2

708 N.Y.S.2d 717, 719 (App. Div. 2d Dep't) (affirming the Family Court's finding that Southerland sexually and physically abused his children), leave to appeal denied, 95 N.Y.2d 767 (2000). These circumstances should have disposed of this case years ago on a basis that would require no opinion.

**II**

The State of New York deemed Southerland unfit to keep custody of his children by reason of his neglect, beatings and sexual abuse. Yet, in a way that seems unaccountable, the panel opinion allows him to seek damages for loss of consortium against the child welfare worker who temporarily removed the children from his home. And it allows the abused children to sue their rescuer for allegedly effecting the rescue prematurely. Our legal system cannot afford such a result. In my view, Mr. Woo conducted himself as a reasonable and conscientious child services worker.

**Fourth Amendment.** The panel concludes that Mr. Woo is not entitled even to qualified immunity on the plaintiffs' Fourth Amendment unlawful search claims, on the ground that errors and omissions in his affidavit for an Order

3

Authorizing Entry to Southerland's apartment would, if corrected, have defeated probable cause. The panel finds fault with Mr. Woo's affidavit because: [1] information is omitted suggesting that Ciara (a daughter who drank a can of paint and later complained of molestation by her father) might not be found at Southerland's apartment because she was said to have run away; [2] Ciara's swallowing of a can of paint was characterized as a suicide attempt; [3] no mention is made that Ciara swallowed the paint at school (rather than in Southerland's apartment); and [4] the children listed were the six children living with Southerland's former "common-law wife," Diane Manning, not the six children living with Southerland. See Southerland, 2012 WL 1662981, at *13-14, *16.

I find it uncontroversial (to say the least) that a child welfare worker has probable cause to believe that a child may be found on the premises of the residence of her custodial parent. Moreover, Southerland himself would be the ultimate source for any report that Ciara had "run away." Even if Mr. Woo believed Southerland's report that Ciara had run away, he still would have had cause to believe that she might be found in Southerland's apartment--she

4

could have returned home, or been returned, or her father may have lied, and she might have been there all along enduring his sexual abuse. Mr. Woo cannot be faulted for starting his investigation of child abuse at the child's legal residence. And one must hope that child abusers do not learn that probable cause for a warrant can be defeated by a parent's assurance that his abused child is no longer residing at home.

As to the affidavit's characterization of Ciara's paint swallowing, it seems obvious that this was a suicide attempt, or at least an ideation of suicide that required prompt intervention. That is how it was understood by the guidance counselor who reported the incident. See id. at *3. It makes no difference whether the incident took place at school or at Southerland's apartment; either way, Southerland's failure to seek medical attention for his daughter bespeaks neglect.

The panel criticizes Mr. Woo for listing the wrong children's names on the application, as if this were an obvious and decisive blunder. Given that there are at least thirteen children and five adults in this decidedly improvised family structure, such an error cannot render the

5

affidavit fatally defective.  Regardless of the children's names, Mr. Woo's application accurately conveyed the basis for his reasonable belief that probable cause existed to think that children in Southerland's apartment were being neglected--*as in fact they were*.  Because there is no "*genuine* dispute that a magistrate would have issued the warrant on the basis of the corrected affidavit[]," Mr. Woo was entitled to judgment as a matter of law.  <u>Walczyk v. Rio</u>, 496 F.3d 139, 158 (2d Cir. 2007) (internal quotation mark omitted).

Even if the supposed errors in Mr. Woo's affidavit were essential to the finding of probable cause--and they plainly were not--there is no basis for thinking that any of the errors were made out of malice or recklessness, as opposed to justified haste.  Mr. Woo is entitled to qualified immunity on that basis alone.  <u>See</u> <u>Golino v. City of New Haven</u>, 950 F.2d 864, 870-71 (2d Cir. 1991) (to sustain a Section 1983 claim based on errors in a warrant affidavit, a plaintiff must show "that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of

6

probable cause" (internal quotation mark omitted)). Plaintiffs never alleged malice, and there is no such record evidence.[1] Absent some such evidence, there can be no genuine issue of material fact necessitating a trial on plaintiffs' claims of unlawful search.

**Due Process and Seizure.** As to the claims of procedural due process and Fourth Amendment unlawful seizure, the panel holds that, at the time the children were removed, it was clearly established law that officials could not remove a child from the custody of a parent (without consent or a prior court order) absent emergency circumstances. Southerland, 2012 WL 1662981, at *18; see also Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir. 1991).

But Mr. Woo as well as his supervisor (who ordered the removal) concluded that an emergency existed. Based on Mr. Woo's observations and what he knew, he reasonably perceived a pattern of neglect and abuse. The panel assumes (though I do not) that a reasonable jury would conclude that Mr. Woo--

---

[1] The panel opinion suggests that Mr. Woo's answer to a deposition question concerning his reason for entering the Southerland apartment implies that he knew Ciara Manning would not be found there. Not so: Mr. Woo explained that he sought to enter the apartment to look for "[t]he Manning children," which obviously includes Ciara. Southerland, 2012 WL 1662981, at *16 (brackets in original).

7

who was found in Family Court to have truthfully reported Southerland's sexual and corporal abuse--is lying about perceived evidence of neglect, whereas Southerland--who was found to have lied in Family Court when he denied the abuse--is telling the truth about maintaining a home for the children that was tidy, safe, and stocked with nourishing food.  But in any event, a pattern of neglect was manifested by facts that cannot be disputed: Southerland's reported failure to seek medical attention for Ciara after her suicide attempt, or for Venus, whom caseworkers found limping from a foot injury she incurred after stepping on an exposed nail.  As the opinion concedes, this Circuit has never "set forth exhaustively the types of factual circumstances that constitute imminent danger justifying emergency removal."  Southerland, 2012 WL 1662981, at *17. That seems to me to be a wise forbearance.  But here, where no medical treatment was sought notwithstanding that the Southerland children were at risk for suicide and lockjaw, it was not objectively unreasonable for Mr. Woo to believe that the children were "bereft of adequate care or supervision" and that their removal was therefore justified. Robison v. Via, 821 F.2d 913, 922 (2d Cir. 1987).  The

8

panel's contrary decision undermines our precedent, which has "emphasize[d] . . . the importance of the availability of qualified immunity where child welfare workers are seeking to protect children from abuse."  Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir. 1999); see also id. ("If caseworkers of reasonable competence could disagree on the legality of a defendant's actions their behavior is protected." (internal quotation marks and brackets omitted)).

**III**

Nothing can account for such an opinion and result except the panel's tacit assumption that Mr. Woo is merely a nominal defendant, that the City of New York will take on his defense and indemnify him for any judgment, and that litigation like this is not really a claim against the individual but is in effect an instrument for developing ever more ramified constitutional principles and for policing governmental compliance with these constitutional developments.  This is an almost-complete misconception of Section 1983 claims against individuals.

An individual defendant has at stake his savings, his

9

pension, the equity in his home, the kids' college fund:
This should tell us something about the threshold of
liability.  Properly applied, Section 1983 punishes
intentional and egregious violations of constitutional
rights while respecting the discretion of government actors,
and tolerating their good faith errors and misjudgments.
See Defore v. Premore, 86 F.3d 48, 50 (2d Cir. 1996) (per
curiam) (discussing the "importance of the defense of
qualified immunity to insure that publicly employed
caseworkers have adequate latitude to exercise their
professional judgment in matters of child welfare").

The drift of the law that has carried this case along
has been to ignore the standard appropriate to liability of
individuals, and to assume that a Section 1983 action is in
effect a suit *not* against the individual defendant but
against the government subdivision that employs him.  This
buried assumption inheres in other cases; but this case
raises it to the surface.  There are several things wrong
with that approach.

- Municipalities are not liable under Section 1983
for the actions of their employees based on *respondeat
superior*; municipalities are liable only if the violation of

10

individual rights results from the "government's policy or custom." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-94 (1978). The idea that the municipality or other state subdivision is the real defendant in a case against the individual is thus an end-run around Monell.

● We have come to treat municipal indemnification like insurance, and in that way discount the harshness of a potential damages award against the individual government worker. Of course, juries are not permitted to consider the availability of insurance in assessing fault. See, e.g., Fed. R. Evid. 411; Salm v. Moses, 13 N.Y.3d 816, 817 (2009) (memorandum). One reason is the risk that jurors would disregard controlling principles in order to compensate plaintiffs without valid claims and over-compensate those whose claims are valid. See Loughlin v. Brassil, 79 N.E. 854, 857 (N.Y. 1907) (observing that "in the case of an individual defendant it might make it much easier to find an adverse verdict if the jury understood that an insurance company would be compelled to pay the verdict"). Universally, juries are insulated from the temptation to distort the law in that way; it would be healthy if we recognized the comparable risk that municipal

11

indemnification poses to judicial consideration of Section 1983 claims.

● The premise--that a suit against an individual government employee is in substance a suit against his employer--is also wrong. In the City of New York (and doubtless in some other political subdivisions of this Circuit), the government supplies defense counsel and pays the judgment--except in the egregious cases to which alone Section 1983 should apply. But this Circuit includes scores of counties and hundreds of towns and municipalities; and there are thousands of political subdivisions in the nation. Not all of them will indemnify their employees for Section 1983 judgments; many cannot even afford to furnish a defense; some can barely keep the school open. Counterparts to Mr. Woo, who are employed elsewhere, face ruin and bankruptcy in Section 1983 cases.

● There is a big gap between the egregious conduct that supports Section 1983 liability and merely imperfect or negligent conduct. Some would fill that gap by an assumption, contrary to fact, that government workers are all constitutional law professors, or at least lawyers--or that they would be improved if they were. Such persons fail

12

to understand that child welfare workers, teachers, prison guards, probation officers, and police learn and practice the skills of their own demanding professions, and do not in the usual course absorb lengthy opinions of this Court, not all of which are illuminating.

• The panel's opinion and the assumptions that animate it have effects that reach beyond Mr. Woo and the City of New York as his employer: There is a substantial and direct impact on public safety. The imposition of personal liability, particularly in jurisdictions where the judgment is not indemnified or insured, creates an incentive for child welfare workers (and other government employees charged with protecting the public) not to act. When the panel opinion in this case is considered together with DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), holding that state officials have no constitutional duty to protect children against domestic abuse, a perverse incentive is created. A child welfare worker is shielded from liability when she recklessly fails to protect abused children, but she is exposed to personal liability when she acts in good faith to protect them. Faced with these choices, a rational child welfare worker

13

will err on the side of caution every time--and children who otherwise would have been rescued from dangerous and abusive situations will live in peril.

**IV**

We should appreciate that conscientious child welfare workers must promptly make anguished decisions. As judges, we can weigh the legal issues presented and draft at leisure, assisted by a journal of law clerks. Mr. Woo had none of these advantages; and he acted as (one hopes) any dutiful child welfare worker in his position would have done. Not only was Mr. Woo not so "plainly incompetent" as to forfeit the protections of qualified immunity, al-Kidd, 131 S. Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)), his judgment that Southerland was abusing or neglecting his children was spot on, and was vindicated by the Family Court's findings of sexual and physical abuse.

The panel would send Mr. Woo to a jury for an assessment of his liability and the damages he should pay. I would shake his hand.